UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

                                    Criminal No. 03-cr-80244-VAR

-vs-

                                      Honorable Victoria A. Roberts

MARCO PAREDES-MACHADO

       Defendant.

                               /

## DEFENDANT'S RENEWED MOTION FOR DISCLOSURE OF EVIDENCE REGARDING TORTURE

Defendant Marcos Paredes-Machado, through undersigned counsel, STEPHEN G. RALLS, hereby renews his previous *Motion for Disclosure of Evidence Relating to the Torture and the Physical and Psychological Abuse of Defendant and His Wife While They Were in the Custody of Mexican Authorities at the Behest of the United States Government* (doc # 782), as permitted by the Court's ruling of June 21, 2017 (doc. #803). On December 24, 2017, the defense sought the concurrence of Assistant United States Attorney William Sauget regarding this Motion pursuant to E.D.Mich. LR 7.1(a) and E.D.Mich. L.C.R. 12.1, and concurrence was not obtained. This Motion is supported by the attached Brief for Defendant.

DATED:   December 28, 2017

_____/s_____
Stephen G. Ralls, Attorney for Defendant
314 S. Sixth Ave.
Tucson, AZ 85701
Office: (520) 884-1234
Fax: (520) 884-9687
Email: steve@rallslawoffice.com

## STATEMENT OF THE ISSUE

I.      SHOULD THIS COURT ORDER  FURTHER DISCLOSURE FROM THE GOVERNMENT REGARDING THE TORTURE OF DEFENDANT AND HIS WIFE UNDER THE PRINCIPLES ENUNCIATED IN <u>BRADY V. MARYLAND</u> AND FED. R. CRIM. P. RULE 16, AND THEIR PROGENY?

## STATEMENT OF CONTROLLING OR MOST APPROPRIATE AUTHORITY

The following cases and other authorities constitute the authorities that

control, or are otherwise most appropriate to the decision in this matter:

<u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963) ("[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment irrespective of the good faith or bad faith of the prosecution");

<u>Moldowan v. City of Warren</u>, 578 F.3d 351, 381 (6th Cir. 2009) (due process guarantees recognized in <u>Brady</u> also impose an analogous or derivative obligation on the police to disclose exculpatory materials);

<u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985) (Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different");

<u>Youngblood v. West Virginia</u>, 547 U.S. 867, 869-870 (2006)(<u>Brady</u> violation occurs when the government fails to turn over evidence "known only to police investigators and not to the prosecutor");

<u>United States v. Ogden</u>, 685 F.3d 600, 605 (6th Cir. 2012) (evidence is discoverable under <u>Brady</u> when it will lead to admissible evidence, not merely when it is admissible at trial);

Rule 16 of the Federal Rules of Criminal Procedure ("Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph

books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and: (I) the item is material to preparing the defense").

# **TABLE OF CONTENTS**

STATEMENT OF THE ISSUE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -I-

STATEMENT OF CONTROLLING OR
    MOST APPROPRIATE AUTHORITY. . . . . . . . . . . . . . . . . . . . . . . . . . . -I-

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -iii-

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -iv-

BRIEF FOR THE DEFENDANT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -3-
    Procedural Summary and Update
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -3-
    Renewed Request for Disclosure
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
        The Government's actions toward producing further disclosure were
            ineffectual. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
        The evidence that the Government should produce. . . . . . . . . . . . -16-
            Information known to the Government. . . . . . . . . . . . . . . . -16-
            Documents and Evidentiary Items. . . . . . . . . . . . . . . . . . . -17-
            Interviews. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-
        Relevance of the requested items. . . . . . . . . . . . . . . . . . . . . . . . . -19-
        The *prima facie* case made so far. . . . . . . . . . . . . . . . . . . . . . . . . -21-
        The information provided by the Government to date does not fulfill
            its  *Brady* or Rule 16 obligations... . . . . . . . . . . . . . . . . . . -24-

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -29-

REQUEST FOR HEARING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -30-

LIST OF EXHIBITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -31-

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -32-

## <u>INDEX OF AUTHORITIES</u>

### <u>CASES</u>

<u>Brady v. Maryland,</u> 373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . -24-, -27--30-

<u>Carey v. Duckworth,</u> 738 F.2d 875 (7th Cir.1984). . . . . . . . . . . . . . . . . . . . .   -28-

<u>Goff v. Bagley,</u> 601 F.3d 445 (6th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . .   -26-

<u>Kyles v. Whitley,</u> 514 U.S. 419 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   -26-

<u>Moldowan v. City of Warren,</u> 578 F.3d 351 (6th Cir.2009). . . . . . . . . . . . . . .   -26-

<u>Moreno-Morales v. United States,</u> 334 F.3d 140 (1st Cir. 2003). . . . . . . . . . .   -26-

<u>Robinson v. Mills,</u> 592 F.3d 730 (6th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . .   -26-

<u>United States ex rel. Fairman,</u> 769 F.2d 386 (7th Cir.1985). . . . . . . . . . .   -28-, -29-

<u>United States v. Agurs,</u> 427 U.S. 97 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . .   -26-

<u>United States v. Auten,</u> 632 F.2d 478 (5th Cir.1980). . . . . . . . . . . . . . . . . . . .   -28-

<u>United States v. Bagley,</u> 473 U.S. 667 (1985). . . . . . . . . . . . . . . . . . . . . . . . .   -29-

<u>United States v. Brooks,</u> 966 F.2d 1500 (D.C.Cir.1992). . . . . . . . . . . . . . . . . .   -28-

<u>United States v. Degollado,</u> 696 F. Supp. 1136 (S.D. Tex. 1988). . . . . . . . . . .   -20-

<u>United States v. Deutsch,</u> 475 F.2d 55 (5th Cir.1973). . . . . . . . . . . . . . . . . . .   -28-

<u>United States v. Henry,</u>749 F.2d 203 (5th Cir. 1984). . . . . . . . . . . . . . . . . . . .   -29-

<u>United States v. Karake,</u> 281 F.Supp.2d 302 (D.D.C. 2003). . . . . . . . . . . . . . .   -21-

<u>United States v. Lira,</u> 515 F.2d 68 (2d Cir. 1975). . . . . . . . . . . . . . . . . . . . . . .   -20-

<u>United States v. Maturo,</u> 982 F.2d 57 (2d Cir. 1992). . . . . . . . . . . . . . . . . . . .   -20-

United States v. Meregildo, 920 F. Supp. 2d 434 (S.D.N.Y. 2013). . . . . . . . . . . -27-

United States v. Morris, 80 F.3d 1151 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . -26-

United States v. Orsini, 402 F. Supp. 1218 (E.D.N.Y. 1975). . . . . . . . . . . . . . -20-

United States v. Osorio, 929 F.2d 753 (1st Cir.1991). . . . . . . . . . . . . . . . . . . . -28-

United States v. Pierce, 785 F.3d 832 (2d Cir. 2015). . . . . . . . . . . . . . . . . . . . -28-

United States v. Quinn, 537 F.Supp.2d 99 (D.D.C.2008). . . . . . . . . . . . . . . . -28-

United States v. Toscanino, 500 F.2d 267 (2d Cir. 1974), 500 F.2d 26. . . . . . . -20-

United States v. Yousef, 327 F.3d 56 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . -21-

## FEDERAL RULES

Fed. R. Evid. 611(c).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-

Fed. Rule of Crim. Pro. 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -24-, -29-, -30-

## OTHER AUTHORITIES

E.D.Mich. L.C.R. 12.1.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

E.D.Mich. LR 7.1(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

## BRIEF FOR THE DEFENDANT

    A.    <u>Procedural Summary and Update</u>

Much of the factual and procedural background relevant to this motion is already known to this Court from an earlier motion for disclosure that was litigated between April and June of 2017.  (Doc. ##782, 795, 798, 803.) Accordingly, the factual background previously set forth is incorporated herein by reference, and only a brief procedural summary and update is stated here.

On March 31, 2016 the defense first formally requested disclosure from the Government regarding the torture of Defendant Marco Paredes-Machado and his wife.  Having received almost none of the requested information from the Government over the course of the next year, on April 26, 2017, the defense filed a *Motion for Disclosure of Evidence Relating to the Torture and the Physical and Psychological Abuse of Defendant and His Wife While They Were in the Custody of Mexican Authorities at the Behest of the United States Government* (doc. #782.) The Government filed its response (doc #795) and the defense replied (doc #798).

On June 19, 2017, Magistrate Judge Grand conducted a hearing on that motion, among others.  At that hearing the defense introduced Exhibit A – a document that counsel undersigned had discovered only shortly before the hearing, entitled "<u>The Drug Enforcement Administration's International Operations (Redacted) Chapter 3: Investigative Operations</u>."

This document, publically available on the internet, discussed "Sensitive Investigation Units" ("SIUs"), official DEA programs of the type that, according to the Government's disclosure, arrested Mr. Paredes-Machado and his wife. The document explains that SIUs are "vetted" units of police officers of the host country (in this case Mexico) that partner with the United States DEA. SIU personnel support the DEA by conducting investigations, surveillance, or wiretaps on defendants who are arrested in Mexico and ultimately extradited to the United States for prosecution.

The Mexican police officers who become part of an SIU must undergo certain security evaluations, such as background checks, polygraph examinations, and urinalysis, in order to ensure that the information shared with the unit will not be divulged to the target criminal organizations. In return the DEA provides financial support for those officers, with a DEA special agent providing general oversight. The SIU Program is an official DEA program. Examples of SIU expenditures include payments for operation-related costs (such as travel expenses) and equipment for SIUs to use during investigative activities. SIU members participate in a specially designed training course at the DEA Training Academy in Quantico, Virginia. The DEA has developed an SIU Program Manual detailing guidelines for both DEA headquarters and its foreign offices to follow in administering the SIU program and in managing SIU activities. Under the SIU

Program, the DEA can provide SIU members monetary compensation to supplement the salaries they receive from their home agencies.

At the June 19th hearing, Government's counsel informed the Court that it had issued a request under the MLAT[1] to the Government of Mexico for production of some of the information being sought by the defense, and had requested that Mexico respond within the next few weeks.  (R.T. 6/19/2017 at 30, 41.)[2]  The Government also agreed to query the DEA file in Mexico City and to make additional inquiry of various individuals, including the DEA agents in Mexico who have control over any files related to Mr. Paredes-Machado's arrest. (Id. at 47.)  After hearing argument by both sides, Judge Grand ruled that it would be most prudent at that juncture to deny the defense request for further disclosure without prejudice, in order to allow the Government to follow through on its efforts to obtain further information sought by the defense.  (Doc # 803 at p. 10).

On July 13, 2017 the Government filed a declaration by DEA Special Agent Stephen West indicating that he was then making arrangements to travel to Mexico City to examine the DEA file concerning Mr. Paredes-Machado for

_____

[1]  "MLAT" refers to the Treaty on Cooperation between the United States of America and the United Mexican States for Mutual Legal Assistance, signed at Mexico City on December 9, 1987, also known as the Mutual Legal Assistance Treaty.

[2]  "R.T. 6/19/2017" refers to the reporter's transcript of the Motion Hearing of that date filed in this Court as docket item #832.

relevant records.  In response the defense requested that the Government have the entire file copied and disclosed to this Court for *in-camera* review, allowing for an independent determination of the relevancy of the contents.[3]  The Government did not do so.  Instead Agt. West just examined the file and reported his personal conclusion that it contained no documents of any actions by the DEA or the SIU leading up to, during, or after the arrest of Mr. Paredes-Machado or his wife.

On July 17, 2017, the Government disclosed one four-page DEA-6 report authored by Agent Michael Garcia.  This report added nothing relevant to what was known to the defense before the previous motion was litigated.  Also on July 17, 2017, the defense sent a letter to the Government making specific disclosure requests regarding the SIU that arrested Mr. Paredes-Machado and his wife.  (See Exhibit A to this Motion.)

On August 7 and October 3 the Government disclosed about a dozen more DEA-6 reports about the investigation leading up to the arrest.  Covering the time period before the arrest, they too contained no information about the arrest itself and were thus not germane to the torture issue.  Also disclosed on August 7 was a heavily redacted printout of an email dated January 12, 2011, from DEA North and Central Americas Region Assistant Regional Director (ARD) Carlos Mitchem to a party whose identity has been blacked out.  It stated that Mr. Paredes and his

---

[3]  A copy of that letter is attached to this Motion as Exhibit A.

wife were in custody and would soon be served with a Detroit provisional arrest

warrant, but it did not discuss the arrest itself.  The defense has received no other

reports about the arrest.[4]  The defense has asked the Government to be allowed to

interview the DEA agents who precipitated the arrests of Mr. Paredes-Machado

and his wife, as well as the Mexican police officers who made the arrests.  The

Government initially agreed to those interviews.  Later, however, the Government

refused to permit interviews of the U.S. agents, but did agree to request that the

Mexican Government permit interviews of the Mexican officers.

In late October the Government of Mexico agreed to make available for

depositions under the MLAT the Mexican police officers who arrested Mr.

Paredes-Machado and his wife, and the doctor who examined Mr. Paredes-

Machado the next morning.  The depositions were conducted on November 29,

2017 in Mexico City.

Three persons were deposed.  The first was Dr. Jose Antonio Viveros

Orozco, the doctor who examined Mr. Paredes-Machado at 2:40 a.m. on the

morning after the arrests.   The second person deposed was Deputy Officer Diana

Elizabeth Gonzalez Garcia, the female officer who was primarily in charge of

handling Mr. Paredes-Machado's wife, Rosa Icela.  The last person deposed was

---

[4]  On September 13, 2017 the Government also mailed the defense an
excerpt of the Presentence Investigation Report of Allen Ozdemir.  That disclosure
stems from a different motion unrelated to the disclosure requested herein.

Deputy Officer Jorge Adrian Hernandez Castro, whom Mr. Paredes-Machado remembers as the "Comandante," in charge of the overall operation.  Transcripts of those depositions are attached to this Motion as Exhibit B (deposition of Dr. Viveros Orozco), Exhibit C (deposition of Ofc. Gonzalez Garcia) and Exhibit D (deposition of Ofc. Hernandez Castro).

These depositions, however, were functionally useless for several reasons. The first is that they were conducted under Mexican procedural rules, which did not allow for leading questions.[5]  Nor was a witness allowed to physically demonstrate things not in his report.  (Exhibit B at 19.)  It is well settled that effective examination of hostile witnesses requires the use of leading questions and further explication of information that a witness chooses not to put in his report.  See e.g. Fed. R. Evid. 611(c) (permitting leading questions upon cross examination or with hostile witnesses).  Thus, through the Mexican Government's dogged protection of these officers from leading questions and penetrating examination, effective interrogation was greatly restricted and valid examination

---

[5]  Ms. Maria Elizabeth Altamira Flores, Adjunct Director for Judicial Assistance in Mexico appeared on behalf of the witnesses and objected numerous times to questions she deemed as "leading."  (Exhibit B at 21, 22, 25; Exhibit C at 28, 33; Exhibit D at 24, 27, 28.)  Ms. Altamira stated, "According to Mexico Law, those questions can be objected, because in this country, you cannot ask conducive questions – inductive questions."  (Exhibit B at 21.)  When defense counsel stated that the objection would be noted for the record, but the witness would be asked to answer, Ms. Altamira repeated her objection and forced counsel to re-phrase his question so it would not be leading.  Id.

of hostile witnesses was effectively precluded.  Essentially, counsel was only allowed to elicit from the witnesses what was already in their reports.

These restrictions allowed at least one witness, Ofc. Hernandez Castro, to make numerous obviously-false statements without contradiction or effective impeachment.  One example was whether he was part of an SIU.  The DEA-6 Reports disclosed by the Government make it clear that the Paredes-Machado arrests were made by an "SIU" – a Sensitive Investigative Unit.[6]  Ofc. Diana Elizabeth Gonzalez Garcia admitted that she was part of the SIU as well:

> Q:     And are you specifically assigned to the SIU, Special Investigations Unit, Otherwise known as SEIDO?
>
> A:     Yes.

(Exhibit C at 13.)  And both Ofc. Gonzalez Garcia and Ofc. Hernandez Castro agreed that they were "partners."  (Exhibit C at 19, 25; Exhibit D at 19, 29.)   Yet Ofc. Hernandez Castro feigned ignorance when asked whether he was part of an "SIU."  (Exhibit D at 17-18.)  He later admitted to having been part of an unnamed

---

[6] E.g. "*A detachment of SSP/SIU personnel* were deployed to the location and *arrested PAREDES and his wife* without incident."  Report of DEA Agt. Michael Garcia dated 1/21/2011 at 3, emphasis added.  (The "SSP" refers to the "Secretaría de Seguridad Pública, or Secretariat of Public Security, headquartered in Mexico City, once a part of the Mexican Federal Cabinet, but dissolved in 2013.)  See also Report of Agt. C.S. Thompson dated 1/19/2011 at 9, 10 discussing items seized from Mr. Paredes-Machado as a result of "*his arrest by SSP SIU* in Mexico City, Mexico, on January 11, 2011," and information disclosed to the DEA *by the SSP/SIU* about statements that Mr. Paredes-Machado made *upon his arrest*.  (Emphasis added.)

special unit within the antidrug division, but testified that at the time of these arrests he was no longer part of an SIU.  (Id. at 19.)

Likewise, Ofc. Hernandez testified that he was not in charge of the arrest operation, although the female officer, Diana Elizabeth Gonzalez Garcia, admitted that he was her "superior," (Exhibit C at 25), and that others informally called him "Comandante."  (Exhibit D at 15-16.)  One wonders how Mr. Hernandez Castro could have been the partner and supervisor of an officer in the Special Investigation Unit that arrested Mr. Paredes-Machado, and yet not be a member of the SIU himself.

Officers Gonzalez Garcia and Hernandez Castro also stated that Mr. Paredes-Machado was not handcuffed when he was arrested or transported. (Exhibit C at 16, 37; Exhibit D at 12, 25.)  However, a medical examination conducted within minutes of his leaving these officers' custody disclosed wounds on Mr. Paredes-Machado's wrists that obviously came from restraints to his wrists. The report states the following findings:

> Two parallel and linear excoriations. The first one is five centimeters long and the second is three centimeters long. Both are located on the back of his right hand. Another linear excoriation, nine centimeters long, is on the back of his left hand. One six-centimeter linear excoriation is on the front side, distal third, of left forearm. One seven-centimeter linear excoriation is on the front side, distal third, of right forearm. Yellow ecchymosis (4 x 3 centimeters), located in the second intercostal space above the right mid-clavicular line.

(Exhibit E to this Motion, Report of Dr. Jose Antonio Viveros Orozco dated

January 12, 2011, at 2:20 a.m. at SEIDO.)

As this medical report establishes, Mr. Paredes-Machado had two linear cuts parallel to each other on the back of his right hand, one about two inches long and the other about one inch long. A cut about three and a half inches long, was present on the back of his left hand, and on the front of his left wrist was a cut almost two-and-a-half inches long. That two-and-a-half-inch cut to his left wrist was so severe that Mr. Paredes-Machado still bears the scar from it to this day. Lest there be any confusion that these might have been be old wounds, a report by Dr. Mauro Cabrillo Castillo the next day (January 13) described these as "costra seca" (dried scabs) with ecchymosis (brusing) on the left hand. (Exhibit F to this Motion, Report of Dr. Mauro Cabrillo Castillo Dated January 13, 2011.) In his deposition, Dr. Viveros Orozco admitted that these were fresh lacerations, inflicted just hours before the examination, which occurred at 2:40 a.m. (Exhibit B at 13, 20.) Officers Gonzales Garcia and Hernandez Castro explicitly stated that Mr. Paredes-Machado was never out of their custody during that time. (Exhibit C at 16, 22; Exhibit D at 25.)

Common sense says these "dried scabs" were precisely the kind of wounds that would have resulted from a struggle against handcuffs while being tortured. Mr. Paredes-Machado says that is exactly what they were. (See Exhibit A to Initial Motion, doc. #782.) In addition, the examination by Dr. Cabrillo Castillo

-11-

found a small dry scab on his left gluteus, "apparently from scratching."[7]  This fits with Mr. Paredes-Machado's description of his struggle against handcuffs behind his back while being water-boarded face-up, during which his captors jammed a knee into his stomach to make him inhale water into his lungs.

The most important of these officers' many blatant falsehoods during the depositions concerns the time during which Mr. Paredes-Machado and his wife were tortured and then interrogated on video.  Both officers admit that Mr. Paredes-Machado and his wife were in their custody at the relevant times, but they claimed that neither were questioned and no video was made while they had custody of this couple.  (Exhibit C at 22, 39-40; Exhibit D at.)  The officers testified that they made the arrests near Hospital Angeles[8] at around 8:45 p.m.[9] (Exhibit C at 13, 15, 16, 22, 31; Exhibit D at 10, 14.)  The officers further testified that they took the captives directly to the offices of SEIDO (Subprocuraduria Especializada en Investigacion de Delincuencia Organizada, or Attorney General's

_____

[7]  See Exhibit F to this Motion, Report by Dr. Mauro Cabrillo Castillo dated January 13, 2011, at p.1, finding: "costra seca de cero punto cinco centímetros en glúteo izquierdo al parecer por rascado," or "dry scab of 0.5 centimeters on left gluteus apparently from scratching."

[8]  (Exhibit C at 14.)  The address of Hospital Angeles is Vialidad de la Barranca No. 22, Col. Valle de las Palmas. C.P. 52763, Huixquilucan, Estado de Mexico. (See Exhibit I, infra at p.1)

[9]  Both Mr. Paredes-Machado and his wife say they were actually arrested around 6:00 p.m.  See Exhibits A and D to the initial Motion, doc. #782.

Specialized Organized Crime Investigation Unit.)  (Exhibit C at 14-15, 31, 36;

Exhibit D at 11-12, 17, 25.)

SEIDO is only about a dozen miles away from the hospital in the downtown

area.[10]  Driving time for that trip should be about 50 minutes to one hour.  Yet the

officers stated that they arrived at SEIDO around midnight, more than three hours

after the arrests.[11]   The officers claimed that it was "rush-hour," and traffic was

heavy, but it defies belief that at 9 p.m. on an ordinary Tuesday night a 50 minute

trip required anywhere near three hours.  Their claim that there was no other stop

is simply not credible.

Even more disturbing is the officers' testimony regarding the video

interrogation of Mr. Paredes-Machado and his wife.  The official DEA reports

describe that video recording as having been made by the "SSP/SIU."[12]  And,

indeed, the video file appears to have been finalized at 11:51 p.m.[13] on January 11,

---

[10]   SEIDO is located at Paseo de la Reforma 75, Guerrero, 06300 Ciudad de México, CDMX, Mexico.  (Exhibit C at 15.)

[11]   A contemporaneous document indicates that they actually may have arrived at 2:00 a.m., some five hours later.  (See Exhibit G to this Motion, Evidence Sheets, listing arrival time of 2:00 a.m. January 12, 2011.)

[12]   Report of Special Agt. Michael Garcia dated 2/16/11, which states, "Following the arrests, ***SSP/SIU conducted a recorded interview*** with PAREDES, as well as his wife. SSP/SIU provided DEA MCCO with a copy of the taped interviews." (Emphasis added.)

[13]   See Exhibit H to this Motion, Affidavit of computer forensic expert Brian Chase.

-13-

2011, at which time Mr. Paredes-Machado and his wife were still in the custody of Officers Hernandez Castro and Gonzalez Garcia, according to their own testimony.

The officers claimed they arrested the couple around 8:45 p.m., and both officers stated that neither Mr. Paredes-Machado nor his wife were out of their custody from the time of their arrest until their delivery to SEIDO, supposedly at midnight of January 11-12. (Exhibit C at 16, 22, 40; Exhibit D at 25, 28.) Yet, both Ofc. Hernandez Castro and Ofc. Gonzalez Garcia claimed that no video was made while these prisoners were in their custody. (Exhibit C at 19, 22, 39; Exhibit D at 12-14, 27-29.) That is clearly not possible. The video was created by combining two separate videos, one of Mr. Paredes-Machado and one of his wife, Rosa Icela. (Exhibit H at ¶6.) The process of splicing them together probably began at 11:36 p.m and was completed at 11:51 p.m. Mexico City time. (Id. at ¶ 12.) That process had to have begun after the filming of the component video interrogations themselves was concluded. The video of Mr. Paredes-Machado's interrogation is about 23 minutes long, and his wife's video lasts about 10 minutes. Thus, even if they were completed in a single "take" (which they were not)[14] the interrogations had to have begun well before the editing process started

---

[14] Mr. Paredes-Machado's interrogation was stopped and re-started several times. See Exhibit A to the Initial Motion at ¶ 16.

at 11:36 p.m. – i.e. somewhere around 11:00 p.m. or perhaps earlier.

But the testimony of both of these officers was that Mr. Paredes-Machado and his wife were never out of their custody from 8:45 p.m. to midnight, and no video was made during that time. That testimony was obviously false. It is also obvious why the officers would want to make this facially absurd denial: no prisoner would make such an inculpatory statement, admitting crimes on video, unless coerced to do so. Thus, the video itself is evidence of their coercion, which in this case was water-boarding, beating and extensive physical and psychological abuse. In short, it is clear that these police officers testified falsely. But the rules imposed by the Mexican authorities during the depositions prevented the defense from examining them effectively.

      B.    <u>Renewed Request for Disclosure</u>

           1.    <u>The Government's actions toward producing further disclosure were ineffectual</u>.

To its credit, the Government has attempted to provide answers by setting a deposition in Mexico City of the arresting officers and the examining doctor. Unfortunately, that attempt failed due to restrictions imposed by the Mexican authorities. This prevented the fair questioning of the witnesses in the face of preposterous testimony that is unworthy of belief. Therefore, the defense is in essentially the same position as it was in at the end of the June 19, 2017 hearing: it

has made a *prima facie* showing that Mr. Paredes-Machado was tortured while in the custody of the SIU, which is essentially a creature and agent of the U.S. Government.  Yet the Government has refused to grant the defense access to a great deal of other evidence that is in the control of the Government relating to those actions.

      2.    <u>The evidence that the Government should produce</u>.

The parties tried to obtain the needed information by deposing the Mexican police and doctor in Mexico City, but that effort failed.  Yet, the U.S. Government still has within its grasp much information and numerous evidentiary items to which the defense is entitled, and which cannot be obtained by the defense in any other way, but which the Government still refuses to provide.  These include, but are not limited to, the following general categories of disclosure:

      A.    <u>Information known to the Government</u>

- Whether Mexican authorities notified U.S. authorities before the arrests that the arrests were imminent;

- The names of the U.S. Government Agents who received such notification;

- Whether any U.S. personnel accompanied the arresting officers to the scene of the arrests;

- Whether U.S. Government personnel knew Mr. Paredes-Machado and his wife would be interrogated;

- Whether any U.S. personnel were in the building where the interrogation video was made while it was being made or during the five hours before it was made;

- Whether U.S. authorities ever asked the Mexican authorities to question Mr. Paredes-Machado or his wife;

- Whether any U.S. personnel communicated with the Mexican authorities during the questioning of Mr. Paredes-Machado and his wife via non-face-to-face contact, such as telephone, radio, text messaging etc.;

- Whether the U.S. Government has made any standing requests to the Mexican government regarding how prisoners apprehended at the behest of the U.S. Government are to be treated;

- Whether the US government made any individualized requests to the Mexican government as to how Mr. Paredes-Machado and his wife were to be treated;

- The amount of funding provided by the U.S. Government to the Mexican government for investigating Mr. Paredes-Machado, including, but not limited to, funding the so-called "intel" T-IIIs;

- Information regarding rewards offered or paid by the U.S. Government to Mexican law enforcement personnel for the arrest of Mr. Paredes-Machado;

- The name(s) of the DEA agent or agents who supervised or trained that SIU or participated in the arrests of Mr. Paredes-Machado and his wife;

- Any allegations known to the U.S. Government of torture by members of this or any other SIU, or any other cases in which DEA agents, or other agents of the U.S. Government were present during torture by an SIU.

B.    Documents and Evidentiary Items

- Any reports authored by the DEA agent or agents who supervised this

-17-

SIU regarding these arrests and the subsequent interrogations;

- All reports of debriefings of Mexican agents in this SIU by the DEA regarding these arrests;

- All reports submitted by Mexican authorities to the U.S. authorities about these arrests, including any requests for bonuses or rewards;

- The chain of custody for the video depicting the interrogation of Mr. Paredes Machado and his wife, including the names of all persons involved in recording it and editing it and the corresponding written reports thereof;

- The time sheets of the DEA agents involved with the arresting SIU for January 11-12, 2011;

- All documentation associated with funding for any "intel T-III" in this matter;

- All records showing how much money the U.S. Government paid to the Mexican SIU program annually for the five years preceding 2011;

- All records showing how much money the U.S. Government paid to the members of this SIU, including but not limited to Officers Diana Elizabeth Gonzalez Garcia and Jorge Adrian Hernandez Castro and their superiors;

- All records in the possession of the U.S. Government concerning the employment of Officers Diana Elizabeth Gonzalez Garcia and Jorge Adrian Hernandez Castro by a the U.S. Government Sensitive Investigative Unit ("SIU") Program, including the dates and terms of their employment and the named of their DEA supervisors.

- Copies of training materials furnished by the U.S. Government to that SIU related to the use of torture, the proper collection of evidence, and the admissibility of coerced confessions in U.S. courts;

- All records of DEA contacts with the arresting SIU;

- All documents, reports and other communications to or from Mr.

Joseph E. Evans of the U.S. Embassy, and to or from the U.S. Ambassador, or from any other personnel of the Embassy regarding this matter;

● Any records of the U.S. Consulate in Mexico City requesting the arrest of Mr. Paredes-Machado;

● Any other records of U.S. Government agencies concerning this arrest.

C.   <u>Interviews</u>:

The defense should also be permitted to interview the following U.S. Government witnesses:

● Mr. Joseph E. Evans of the U.S. Embassy;

● DEA Special Agent Jonathan Shankweiler;

● DEA Agent Christopher S. Thompson;

● DEA Agent Michael T. Garcia;

● Any other U.S. person who participated in the arrest of Mr. Paredes-Machado, and his wife.

3.   <u>Relevance of the requested items</u>

As is evident from the foregoing list, even excluding the evidence that is within the exclusive control of the Mexican government, there is still a great deal of undisclosed evidence that remains within the control of the U.S. Government and is relevant to the defense proving that the U.S. Government was complicit in the torture that occurred here.  This is not a "fishing expedition."  The defense has

-19-

made more than a *prima facie* case showing that the torture occurred at the hands of the Mexico City SSP/SIU, and that the SIU is essentially a subsidiary of the U.S. Government, trained in Quantico Virginia, supervised by the DEA and funded in large part by the United States Treasury.

When all of the disclosure issues herein have been finally resolved, the defense will file a motion contending that the present case should be dismissed due to the Government's outrageous conduct regarding the torture of Mr. Paredes-Machado and his wife.  United States v. Toscanino, 500 F.2d 267 (2d Cir. 1974). The defense will also move for the suppression of the coerced statement given by Mr. Paredes-Machado as a result of the torture.

 Courts have established several requirements for defendants in cases such as this, where the torture is inflicted by persons other than U.S. officials.  One requirement is that the defense must make a showing that the persons who physically committed the torture were acting at the direction of U.S. officials or acting as agents of the United States when they were inflicting the abuse.  United States v. Lira, 515 F.2d 68, 70 (2d Cir. 1975) citing Toscanino 500 F.2d at 281; United States v. Orsini, 402 F. Supp. 1218, 1219 (E.D.N.Y. 1975); United States v. Degollado, 696 F. Supp. 1136, 1140 (S.D. Tex. 1988) (dismissal of case not required absent showing that torture occurred "at the request or instruction of the American agents").  See also United States v. Maturo, 982 F.2d 57, 61 (2d Cir.

1992) (evidence obtained in a foreign jurisdiction may be excluded where the

conduct of foreign law enforcement officials rendered them agents, or virtual

agents, of United States law enforcement officials, or the cooperation between the

United States and foreign law enforcement agencies is designed to evade

constitutional requirements applicable to American officials); United States v.

Yousef, 327 F.3d 56, 146 (2d Cir. 2003) (same); United States v. Karake, 281

F.Supp.2d 302, 308 (D.D.C. 2003) (even voluntary non-Mirandized statements

obtained through interrogations by foreign officials are still subject to suppression

when "the conduct of foreign law enforcement officials renders them agents, or

virtual agents, of United States officials.")

The requested disclosure is directed to these requirements.  What acts of

torture were committed, and what was the complicity of the U.S. authorities in

those acts?  The U.S. Government is in exclusive possession of the evidence on

those crucial points, and the defense has made a sufficient showing to be given

access to that evidence.

### 4.    The *prima facie* case made so far.

When the initial defense motion for disclosure was filed, the defense was

not yet aware of the significance of the fact that the Mexican police officers who

arrested and tortured Mr. Paredes-Machado and his wife were members of an

"SIU."  This is not a term used in common parlance, and so far as counsel

undersigned can tell it was not mentioned in any reports disclosed by the

Government until late in the process (March of 2017).  Thus, when the pleadings

requesting disclosure were being prepared, defense counsel had not yet realized

that this term was itself strong evidence of a direct and extremely close tie

between the U.S. Government and the Mexican police officers who carried out this

arrest.

This became known to counsel only after a good deal of research in

preparation for the hearing.  There was nothing in the government's disclosure to

alert the defense that these SIUs are groups of foreign police officers – in this case

police of the Republic of Mexico – organized by, supervised by and financed by

the U.S. Government.  One would not know this from the DEA-6 reports the

Government disclosed to the defense, other than a reference to them being a

"Mexican Federal Police Vetted Unit."  But with no reference to whom they were

"vetted" by, or what they were "vetted" for, this really gave no clue to the defense.

Thus, the defense was hampered in presenting this information to the Court.  It did

so, however, at the hearing, as soon as possible after discovering these facts.

Yet the case linking the U.S. Government directly to this arrest and torture

was already strong even before the defense identified the significance of an SIU.

There were no Mexican charges pending against either Mr. Paredes-Machado or

his wife at the time of their arrests; only the U.S. charges had been filed.  The sole

report authored by Mexican police officers that has been disclosed by the Government to date specifies that they were to be held on "a provisional arrest warrant for purposes of international extradition."[15] Thus, it is readily apparent that the arrest was made for the benefit of U.S. Government.

Additionally, the DEA spent months in 2010 working confidential sources, photographing property, analyzing telephone records, and providing funds to the Mexican police for the wiretap of the subjects' telephones that ultimately resulted in the arrests. Then, during the arrest itself, one of the arresting officers informed Mr. Paredes-Machado that he could not accept a bribe because the U.S. Embassy had already been notified of the arrest. Thus, pervasive U.S. involvement throughout the process is obvious even as the arrest was in progress.

The close ties, funding, and supervision by U.S. authorities evidenced by the participation of an SIU are, of course, highly relevant to whether the torturers in this case were acting as agents of the United States authorities when they were inflicting the abuse. The SIU information uncovered by the defense just before the hearing, coupled with that previously presented in the pleadings, makes at least a *prima facie* case that the persons who inflicted this torture were not just an autonomous body of Mexican law enforcement officers enforcing Mexican law,

---

[15] Exhibit I to this Motion, Federal Police Narcotics Division Official Letter Number PF/DA/CICTA/046/2011, Re: Localization and Presentation; Mexico City January 12, 2011 at p.2.

but instead were a unit organized by the United States government, trained by the

United States government, funded by the United States Government, and

supervised by United States government law enforcement agents.  It was

essentially a subsidiary of the United States government.  Combined, these factors

make a sufficient showing that the defense is entitled to the information and

evidence requested above, in order to demonstrate that the torture to which Mr.

Paredes-Machado was subjected was conducted by persons acting as agents of the

United States.


5.     <u>The information provided by the Government to date does not fulfill
       its *Brady* or Rule 16 obligations.</u>

Rule 16 of the Federal Rules of Criminal Procedure requires the

Government to disclose items within the its control that are material to preparing a

defense.  <u>Brady v. Maryland,</u> 373 U.S. 83, 87 (1963) and its progeny require the

Government to disclose materials favorable to an accused person upon request.

Although the Government has made significant disclosure thus far, its

efforts fall short of what is required.  The disclosure to date identifies none of the

U.S. officials, and only a few of the Mexican officials, involved in the SIU.  By

limiting the disclosure the Government prevents the defense from even trying to

seek out the needed information from the individuals who possess it.  The

Government refuses to disclose the training materials for the SIU, thereby

precluding the defense from demonstrating whether or not that training endorsed or tolerated torture or turned a blind eye thereto.  The Government refuses to provide reports authored by the SIU, either by the Mexican officers, by DEA agents or by other U.S. personnel concerning the arrests and detention of Mr. Paredes-Machado and his wife, thus preventing the defense from establishing what happened in the officers' own words.  The Government provides no documentation of the flow of money it gives to the SIU, thereby hiding the tremendous amount of leverage and control that money funding the U.S. Government to wield.  The Government has provided none of the requested disclosure regarding U.S. Embassy personnel.  No operation of this kind would have been mounted without explicit approval of that embassy.  Nor does it furnish any of the other information that the defense needs to show that the torture was conducted by individuals who are virtual agents of the U.S. Government.

Further, this evidence is within the exclusive possession and control of the U.S. government, and is otherwise inaccessible to the defense.  The defense has requested these items in specific detail but, to date, the Government has provided almost none of the requested information.  The failure to respond is not acceptable:

> Although there is, of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor, if the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the

-25-

prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge.  **When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable**.

United States v. Agurs, 427 U.S. 97, 106 (1976) (emphasis added).

The fact that the requested information may not yet be in the hands of the prosecution or the DEA case agents also does not mean the Government has no duty to obtain and disclose it.  A prosecutor has a duty to learn of any favorable evidence known to the others acting on the Government's behalf in the case.  Kyles v. Whitley, 514 U.S. 419, 437 (1995); Robinson v. Mills, 592 F.3d 730, 735 (6th Cir. 2010).  As a result, investigators have an "analogous or derivative obligation" of disclosure to the prosecutor.  Moldowan v. City of Warren, 578 F.3d 351, 381 (6th Cir.2009).

Of course it is true that Brady and its progeny do not "impos[e] a duty on the prosecutor's office to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue."  Goff v. Bagley, 601 F.3d 445, 476 (6th Cir. 2010), citing, United States v. Morris, 80 F.3d 1151, 1169 (7th Cir. 1996).  Cf. Moreno-Morales v. United States, 334 F.3d 140, 146 (1st Cir. 2003) (federal prosecutors had no duty to learn of materials in possession of Puerto Rico Senate.)  Here, however, the information requested *is in the hands agencies that were intricately involved in the investigation at issue* – the U.S. personnel who ran the SIU, and worked with the Mexican officers who

arrested Mr. Paredes-Machado and his wife.  It is beyond belief that the DEA

agent who functioned as the advisor to this SIU[16] wrote no report of these arrests.

It is beyond belief that the SSP/SIU Commander Ricardo Pacheco and

Comandante Ivan Reyes Arzate filed no reports with U.S. authorities, especially

considering the financial rewards to which they would be entitled from the U.S.

Government as a result of those arrests.  They alone can tell this Court the degree

to which the U.S. Government was involved in these arrests and tortures, and the

degree to which the U.S. Government knew this torture would happen and

permitted it occur.

There is strong evidence to indicate that this involvement was substantial.

It cannot be gainsaid that the DEA, to the extent that it supervised and controlled

this SIU, was closely involved with this investigation, and was therefore

responsible for the torture that resulted therefrom by its paid agents in the Mexican

police forces.  Thus, just as it has long been held that the police must turn over the

information favorable to the defense, so must the prosecution obtain and disclose

information documenting the connection of the U.S. Government and its agents to

the Mexican officers and the torture in this case.  The Government cannot avoid its

Brady obligations by being willfully blind to information in front of it.  United

States v. Meregildo, 920 F. Supp. 2d 434, 445 (S.D.N.Y. 2013), aff'd *sub nom.*

---

[16]  Possibly identified in the disclosure as SIU Agent Luis Santos Pedroza.

United States v. Pierce, 785 F.3d 832 (2d Cir. 2015) citing United States v. Quinn, 537 F.Supp.2d 99 (D.D.C.2008); United States v. Brooks, 966 F.2d 1500, 1502–03 (D.C.Cir.1992); United States v. Osorio, 929 F.2d 753, 761 (1st Cir.1991).  In extending the Brady duty to searches for evidence, the Fifth Circuit framed the matter as one of incentives for the Government, arguing that without the extension "we would be inviting and placing a premium on conduct unworthy of representatives of the United States Government." United States v. Auten, 632 F.2d 478, 481 (5th Cir.1980).  The Seventh Circuit has sounded a similar note, warning that "a prosecutor's office cannot get around Brady by keeping itself in ignorance, or compartmentalizing information about different aspects of a case." Carey v. Duckworth, 738 F.2d 875, 878 (7th Cir.1984).

In effect, the Government cannot say it does not have information just because it is in its left hand (the SIU and its DEA supervisors), instead of its right hand (the nominal DEA case agents).  As the D.C. Circuit noted in Brooks, the Government has a duty to search files maintained by branches of government "closely aligned with the prosecution."  Brooks, 966 F.2d at 1503 citing United States ex rel. Fairman, 769 F.2d 386, 391 (7th Cir.1985); Auten, 632 F.2d at 480–81 ("no suggestion in Brady that different arms of the government are such separate entities as to be insulated one from the other"); United States v. Deutsch, 475 F.2d 55, 57 (5th Cir.1973) (duty to locate information in personnel file of Post

Office employee who testified), <u>overruled on other grounds</u>, <u>United States v.</u>

<u>Henry</u>,749 F.2d 203 (5th Cir. 1984); <u>Fairman</u> 769 F.2d at 391 (prosecution had

duty to disclose worksheet of Chicago police officer who had testified for the

prosecution at a trial).

Thus, it is clear that information that is vital to the defense case exists in the

hands of U.S. Government agencies (<u>e.g.</u> the DEA and State Department), albeit

perhaps not the U.S. Attorney's Office.  This evidence is material to the defense

under <u>United States v. Bagley,</u> 473 U.S. 667, 682 (1985) because there is a

reasonable probability that, if it is disclosed to the defense, the result of the

proceeding will be different – i.e. dismissal of the case for outrageous government

conduct, or suppression of evidence.  Moreover, the agencies who have possession

of the evidence were intricately involved with these arrests, and are therefore

"closely aligned with the prosecution."  For these reasons the information and

evidence they possess should be disclosed to the defense under <u>Brady</u> and under

Rule 16.

## **CONCLUSION**

For the reasons set forth above, the defense respectfully requests that this

Court direct the Government to obtain and disclose the information and documents

that fall within the general categories listed above.  It is further requested that the

Court direct Government's counsel to facilitate interviews of the United States

officials involved in the arrests of Mr. Paredes-Machado and his wife, as

enumerated above.  Finally, it is respectfully requested that this Court order the

Government to disclose to the defense any other information, documents, or other

forms of evidence relating to the Government's participation with the SIU that

made these arrests, and relating to its role in the arrests themselves, beyond those

specifically set forth above.  These requests are based upon the Court's inherent

power to order the requested disclosure to control its docket to ensure that cases

before the court are handled efficiently and fairly, as well as in accordance with

Rule 16 of the Federal Rules of Criminal Procedure and <u>Brady v. Maryland</u>.

## <u>REQUEST FOR HEARING</u>

A hearing on this matter is requested.

DATED:  December 28, 2017

/s

_____
Stephen G. Ralls, Attorney for Defendant
314 S. Sixth Ave.
Tucson, AZ 85701
Office: (520) 884-1234
Fax: (520) 884-9687
*Email: steve@rallslawoffice.com*

## LIST OF EXHIBITS

Exhibit A =   Letter dated July 17, 2017 from Defense Counsel Stephen Ralls to Government's Counsel William Sauget requesting disclosure regarding SIU that arrested Mr. Paredes-Machado and his wife.

Exhibit B =   Reporter's Transcript of Videotaped Deposition of Doctor Jose Antonio Viveros Orozco, Mexico City, Mexico, November 29, 2017.

Exhibit C =   Reporter's Transcript of Videotaped Deposition of Ofc. Diana Elizabeth Gonzalez Garcia, Mexico City, Mexico, November 29, 2017.

Exhibit D =   Reporter's Transcript of Videotaped Deposition of Ofc. Jorge Adrian Hernandez Castro, Mexico City, Mexico, November 29, 2017.

Exhibit E =   English translation of Medical report of Dr. Jose Antonio Viveros Orozco dated January 12, 2011 at 2:20 a.m. at SEIDO.

Exhibit F =   Report by Dr. Mauro Cabrillo Castillo dated January 13, 2011.

Exhibit G =   Evidence Sheets, listing arrival time of 2:00 a.m. January 12, 2011.

Exhibit H =   Affidavit of computer forensic expert Brian Chase

Exhibit I =   Federal police Narcotics Division Official Letter Number PF/DA/CICTA/046/2011, Re: Localization and Presentation; Mexico City January 12, 2011.

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on December 28, 2017, I served a copy of the attached

motion and brief upon William Sauget, Assistant United States Attorney, by filing

same electronically.

s/ <u>*Stephen Ralls*</u>
Stephen Ralls
