UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,                  No. 03-80244

-vs-                            HON. VICTORIA A. ROBERTS

MARCO ANTONIO PAREDES-MACHADO,

              Defendant.
_____/

## MOTION TO DISMISS INDICTMENT
## DUE TO OUTRAGEOUS GOVERNMENT CONDUCT

Defendant Marcos Paredes-Machado, through undersigned counsel STEPHEN G. RALLS, requests that this Court dismiss the indictment in this case due to outrageous government conduct (torture), or if the Court finds dismissal unwarranted, to suppress all statements made by Mr. Paredes-Machado and his wife.  On November 12, 2018 the defense sought the concurrence in this motion pursuant to E.D.Mich. LR 7.1(a) and E.D.Mich. L. C. R. 12.1 from William Sauget, counsel for the United States in this matter, and concurrence was not obtained.  This Motion is supported by the attached Brief for Defendant.

October 4, 2018

                                 _____/s_____
                                 Stephen G. Ralls
                                 Attorney for Defendant
                                 314 S. Sixth Ave.
                                 Tucson, AZ 85701
                                 Office: (520) 884-1234
                                 Fax: (520) 884-9687
                                 Email: *Stephen.Ralls@azbar.org*

## <u>STATEMENT OF THE ISSUE</u>

SHOULD THIS COURT DISMISS THE INDICTMENT IN THIS CASE
ON THE GROUNDS OF OUTRAGEOUS GOVERNMENT CONDUCT?


## <u>STATEMENT OF CONTROLLING OR</u>
## <u>MOST APPROPRIATE AUTHORITY</u>

The following cases and other authorities constitute the authorities that

control, or are otherwise most appropriate to the decision in this matter:

<u>Rochin v. California</u>, 342 U.S. 165 (1952)

<u>County of Sacramento v. Lewis</u>, 523 U.S. 833 (1998)

<u>United States v. Toscanino</u>, 500 F.2d 267 (2d Cir. 1974)

# **TABLE OF CONTENTS**

MOTION TO DISMISS INDICTMENT
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I

STATEMENT OF CONTROLLING OR
MOST APPROPRIATE AUTHORITY. . . . . . . . . . . . . . . . . . . . . . . . . . . I

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

BRIEF IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS INDICTMENT. . . . . . . . . . . . . . . . . . . . . . . . . . 2
    I.    FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        A.    Previous factual statements . . . . . . . . . . . . . . . . . . . . . . . . . 2
        B    The Charges: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        C.    United States Involvement in the Investigation . . . . . . . . . . . 3
        D.    The Arrest and Torture of Mr. Paredes-Machado. . . . . . . . . 6
        E.    The Arrest and Torture of Mr. Paredes-Machado's wife . . . . 19
        F.    The Video in the Government's Disclosure . . . . . . . . . . . . . . 23
        G.    Defense Requests for Disclosure. . . . . . . . . . . . . . . . . . . . . . 27
    II.    REASONS FOR DISMISSAL . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
        A.    The Torture and Abuse, Both Physical and Psychological,
            Inflicted on Mr. Paredes-Machado and His Wife by Mexican
            Authorities Acting On behalf of the United States Government
            Are Shocking to the Conscience, and Violated the Due Process
            Clause of the United States Constitution. . . . . . . . . . . . . . . . 43
            1.    Mr. Paredes-Machado and his wife were subjected to
                torture. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
            2.    The Torture of Mr. Paredes-machado and His Wife Is
                Attributable to the United States Government Because
                the U.S. Government Knew this Would Happen, and
                Because the Abuse Was Inflicted by Officers of a Special
                Investigative Unit That Is Essentially a Subsidiary of the
                U.S. Government. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
                a.    The arrest was orchestrated by and for the U.S.

                  Government. . . . . . . . . . . . . . . . . . . . . . . . . . . 48

           b.    The U.S. Government was well aware that the Mexican authorities often subject captured persons to torture. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

           c.    The SIU that arrested Mr. Paredes-Machado and his wife was essentially a subsidiary of the U.S. government . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

      3.    This Court Has the Authority to Dismiss the Indictment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

           a.    Entrapment Cases must Be Distinguished from Those Involving "Shockingly Abusive" Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

           b.    Cases about "Shockingly Abusive" Conduct Show That Dismissal Is Required. . . . . . . . . . . . . . . . 63

           c.    The Ker-Frisbie Doctrine is Inapplicable here. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

           d.    The *Toscanino* Line of Cases Applies here . . . . 67

    B.    The Facts of the Present Case Require Dismissal of This Indictment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

      1.    The Torture and Coercion of Mr. Paredes-Machado and His Wife Are Shocking to the Conscience . . . . . . . . . . 73

      2.    The U.S. Government Cannot Be Permitted to Benefit In Our Courts of Law From Turning a Blind Eye to the Practices it Knows to Exist. . . . . . . . . . . . . . . . . . . . . 74

      3.    Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

 III.    REQUEST FOR HEARING . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

 IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

INDEX TO EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

# TABLE OF AUTHORITIES

**CASES**                                                         **PAGE**

Alvarez–Machain, 504 U.S. 655 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  65

Bivens v. Six Unk. Ag'ts of Fed. Bureau of Narcotics, 403 U.S. 388 (1971). . .  60

Carter v. United States, 530 U.S. 255 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . .  71

Chavez v. Martinez, 538 U.S. 760 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  64

Cornejo-Barreto v. Seifert, 218 F.3d 1004 (9th Cir. 2000) . . . . . . . . . . . . . . . . 49

County of Sacramento v. Lewis, 523 U.S. 833 (1998) . . . . . . . . . . . . .  62- 63, 77

DeShaney v. Winnebago Co. Dept. of Social Servs., 489 U.S. 189 (1989) . . . .  64

Erickson v. United States, 976 F.2d 1299 (9th Cir. 1992) . . . . . . . . . . . . . . . . . 49

Ex rel. Lujan v. Gengler, 510 F.2d 62 (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . .  68

Frisbie v. Collins, 342 U.S. 519 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64-66

Gerstein v. Pugh, 420 U.S. 103 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Hampton v. United States, 425 U.S. 484 (1976) . . . . . . . . . . . . . . . . . . . . . .  60,  62

In re Weir, 495 F.2d 879 (9th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Jackson v. Denno, 378 U.S. 368 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Ker v. People of State of Illinois, 119 U.S. 436 (1886) . . . . . . . . . . . . . . . . . 64-66

Kinsella v. United States ex rel. Singleton, 361 U.S. 234 (1960) . . . . . . . . . . .  62

Malinski v. New York, 324 U.S. 401 (1945). . . . . . . . . . . . . . . . . . . . . . . . . . . .  60

iv

Matta-Ballesteros v. Henman, 896 F.2d 255 (7th Cir. 1990) . . . . . . . . . . . . . . . . 70

McNabb v. United States, 318 U.S. 332 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . 67

Miranda  v. Arizona, 384 U.S. 436 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . 17,  23

Palko v. Connecticut, 302 U.S. 319 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Rochin v. California, 342 U.S. 165 (1952) . . . . . . . . . . . . . . . . . . . . . 59-64, 67-68

Snyder v. Massachusetts, 291 U.S. 97 (1934) . . . . . . . . . . . . . . . . . . . . . . . . . 60

Summitt v. Bordenkircher, 608 F.2d 247, 250 (6th Cir. 1979) . . . . . . . . . . . . . . 78

United States v. Anderson, 472 F.3d 662 (9th Cir. 2006) . . . . . . . . . . . . . . . . . 70

United States v. Booker, 728 F.3d 535 (6th Cir. 2013) . . . . . . . . . . . . . . . . . . . 64

United States v. Cordero, 668 F.2d 32 (1st Cir. 1981) . . . . . . . . . . . . . . . . . . . . 71

United States v. Darby, 744 F.2d 1508 (11th Cir. 1984) . . . . . . . . . . . . . . . . . . 71

United States v. Degollado, 696 F. Supp. 1136 (S.D. Tex. 1988). . . . . . . . . . . . 71

United States v. Fernandez-Caro, 677 F. Supp. 893 (S.D. Tex. 1987) . . . . . . . . 49

United States v. Lambros, 65 F.3d 698, 701 (8th Cir.1995) . . . . . . . . . . . . . . . . 79

United States v. Lara, 539 F.2d 495 (5th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . 71

United States v. Lira, 515 F.2d 68 (2d Cir. 1975) . . . . . . . . . . . . . . . . . 47,  69-70

United States v. Lopez, 542 F.2d 283 (5th Cir. 1976). . . . . . . . . . . . . . . . . . . . 71

United States v. Marzano, 537 F.2d 257 (7th Cir. 1976). . . . . . . . . . . . . . . . . . 71

United States v. Matta–Ballesteros, 71 F.3d 754 (1995). . . . . . . . . . . . . . . . . . 70

United States v. Orsini, 402 F.Supp. 1218 (E.D.N.Y.1975) . . . . . . . . . . . . . . . 79

v

United States v. Patterson, 812 F.2d 1188 (9th Cir. 1987) . . . . . . . . . . . . . . . . . 49

United States v. Pelaez, 930 F.2d 520 (6th Cir. 1991) . . . . . . . . . . . . . . . . .  47, 72

United States v. Postal, 589 F.2d 862 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . 71

United States v. Reed, 639 F.2d 896 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . 71

United States v. Romano, 706 F.2d 370 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . 71

United States v. Rosenthal, 793 F.2d 1214 (11th Cir. 1986) . . . . . . . . . . . . . . . 71

United States v. Russell, 411 U.S. 423 (1973). . . . . . . . . . . . . . . . . . . . . . . . . 60-62

United States v. Struckman, 611 F.3d 560 (9th Cir. 2010) . . . . . . . . . . . . . . 70-71

United States v. Toscanino, 500 F.2d 267 (2d Cir. 1974) . . . . . . . . .   67-70, 72, 79

United States v. Valot, 625 F.2d 308 (9th Cir.1980). . . . . . . . . . . . . . . . . . . . .  70

United States v. Virbickas, 2013 WL 5246136 (E.D. Mich. Sept. 18, 2013)   71-72

## FEDERAL STATUTES                                         PAGE

21 U.S.C. §§841(a)(1), 846, 952(a), 960 and 963 . . . . . . . . . . . . . . . . . . . . . . . .  2

## FEDERAL RULES                                             PAGE

Fed. R. Evid. 611(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

## OTHER AUTHORITIES                                         PAGE

8 C.F.R. § 208.18(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

E.D.Mich. L.R Cr P. 12.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

E.D.Mich. LR 7.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

**OTHER SOURCES**

Amnesty International report, <u>Out of Control: torture and other ill-treatment in Mexico</u> (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 56

Evan Wallach, <u>Waterboarding Used to Be a Crime</u> washingtonpost.com Sunday, November 4, 2007, http://www.washingtonpost.com/wp-dyn/content/article/2007/ 11/02/AR2007110201170_2.html . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   45

Hon. Evan Wallach, <u>Drop by Drop: Forgetting the History of Water Torture in U.S. Courts</u> 45 Colum. J. Transnat'l L. 468 (2007) . . . . . . . . . . . . . . . . . . . . . . .   45

Inter-American Commission on Human Rights of the Organization of American States issued its <u>Report on the Situation of Human Rights in Mexico</u> . . . . . . 51-52

Juan E. Mendez, <u>Report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, Addendum, Mission to Mexico,</u> (29 December 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Mexican National Commission of Human Rights (Comisión Nacional de los Derechos Humanos) - http://www.cndh.mx/Recomendaciones. . . . . . . . . . . . .   56

<u>Open Letter to Attorney General Alberto Gonzales</u>, Human Rights Watch, 5 April 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

Ross, Brian; Richard Esposito ABC News, <u>CIA's Harsh Interrogation Techniques Described</u> (18 November 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

<u>United States Department of State, Bureau of Democracy, Human Rights and Labor, Country Reports on Human Rights Practices</u> for 2014 . . . . . . . . . . . . .   51

<u>United States Department of State, Bureau of Democracy, Human Rights and Labor, Country Reports on Human Rights Practices</u> for 2009 . . . . . . . . . . . . .   51

## BRIEF IN SUPPORT OF DEFENDANT'S
## MOTION TO DISMISS INDICTMENT

I.    FACTS

 A.    Previous factual statements

 Much of the factual and procedural background relevant to this motion is already known to this Court from earlier motions regarding disclosure that were litigated between April of 2017 and November of 2018.  (Doc. ##782, 795, 798, 803, 834, 838, 845, 845, 846, 849, 854, 861,  and 862.)  Accordingly, the more detailed factual background statements set forth therein are incorporated in this Motion by reference, and a more abbreviated version of the facts relevant to this motion is set forth here.

 B    The Charges:

 Mr. Paredes-Machado is charged with two offenses: (1) Conspiracy to Distribute  Marijuana; and (2) Conspiracy to Import  Marijuana, both involving more than 1,000 Kilograms of Marijuana in violation of 21 U.S.C. §§841(a)(1), 846, 952(a), 960 and 963.  The statutory sentencing range for these charges is ten years to life in prison; a fine of up to $4,000,000 is also authorized.  The Indictment alleges Mr. Paredes-Machado conspired with other individuals to import and distribute marijuana to the Detroit area, and elsewhere in the United States.

2

C.    United States Involvement in the Investigation:

Mr. Paredes-Machado was indicted in this matter on November 9, 2005.

(Doc. # 394.)  In May of 2010 the United States Embassy requested the interim

detention of Mr. Paredes-Machado by Mexico for the purpose of extradition on

that indictment.  DEA-6 reports in the Government's disclosure of 3/30/17 state

that DEA special agents recruited two confidential sources in that month who had

current information about Mr. Paredes-Machado's activities, assets, and physical

location.  The Hermosillo, Mexico,  Resident Office of the DEA conducted a

number of "coordination meetings" between DEA agents and agents of the

Mexican Secretaria de Seguridad Publica (Secretariat of Public Security or

"SSP"), a Mexican federal law enforcement agency.[1]

By August 2010 one of the confidential sources had obtained the physical

locations of more than 20 properties and other assets of Mr. Paredes-Machado.  In

late September of 2010, working with telephone records, the DEA identified the

telephone number of a certain telephone that they believed to be in the possession

of Mr. Paredes-Machado.  They then provided that number to the Mexican SSP

"for further exploitation, along with funding support" for what reports in the

---

[1] Mexican President Enrique Peña Nieto dissolved the SSP in January of 2013, replacing it with the "National Security Commission."

disclosure of 3/30/17 refer to as an "'intel' T-III" on that number.[2]  Just before the "intel T-III" (i.e. wiretap) was about to start, however, the Mexican authorities learned that the activity on the telephone had stopped a few days earlier, so it did not go forward.

On December 7, 2010, Mr. Joseph E. Evans of the United States Embassy in the Federal District of Mexico sent a letter to Mr. Irving Barrios Mojica, head of the Mexican Attorney General's Special Money Laundering Investigations Unit. (Exhibit A to this Motion).  Mr. Evans stated that the DEA office in Hermosillo, Sonora had been assisting the SSP to locate and arrest Mr. Paredes-Machado.  (Id.) It also stated that in the previous months the DEA had also been assisting the Mexican government in locating properties belonging to Mr. Paredes-Machado, whom they characterized as a "fugitive" from a Detroit arrest warrant, although there is no indication that he knew of the charges before the arrest.  The letter identified 18 different parcels of land that the U.S. government wanted the Mexican authorities to investigate, stated that a Special Agent Jonathan Shankweiler had already provided further details, and indicated that photos of the properties had been attached.  (Id.)

---

[2]  The term "intel T-III," appears to be DEA jargon for a wiretap that is requested and funded by United States law enforcement officers, but carried out by foreign government authorities, in this case Mexican police.  It is undertaken pursuant to Mexican law, not U.S. law, permitting the Government to evade the wiretap safeguards embodied in U.S. law.

The DEA continued analyzing call records from the telephone they decided not to tap, and eventually deduced that a certain telephone number was being used by Mr. Paredes-Machado's wife, Rosa Icela Ponce de Paredes (known before marriage as Rosa Icela Ponce de Valencia).  On December 14, 2010, DEA agents requested that the SSP initiate an "intel T-III" wiretap on that phone, and again submitted U.S. funding for it to the Mexican authorities.  As a result unspecified individuals were able to eavesdrop on calls made from the telephone of Rosa Icela, and learned that she had scheduled a medical appointment at a hospital in Mexico City.  A detachment of SSP personnel staked out the hospital, and they arrested Mr. Paredes-Machado and his wife without incident on January 11, 2011, as they left the doctor's appointment.  The government's disclosure of 3/30/17 states that, on the same day as the arrest, SSP Drug Commander Ramon Eduardo Pequeno Garcia informed Mr. Carlos Mitchem, DEA Assistant Regional Director for North and Central America, of the arrest.[3]

---

[3] Mr. Pequeno Garcia was later among a group of high-ranking Mexican officials whom alleged drug kingpin Edgar Valdez Villarreal (aka "La Barbie") accused in a 2012 letter of taking bribes in return for giving information.  See http://www.borderlandbeat.com/2012/11/extradition-update-and-letter-from-la.html.  In addition, the Mexican newspaper Excelsior reported that Mr. Pequeno Garcia was removed from his post as head of the Intelligence Division of the Federal Police in July of 2015 after the escape of Juaquin "El Chapo" Guzman, as Mr. Pequeno Garcia had been in charge of the monitoring of the security cameras in the prison where El Chapo was being held at the time of his escape.  See http://www.excelsior.com.mx/nacional/2015/07/16/1034801.

D.     The Arrest and Torture of Mr. Paredes-Machado.

After Mr. Paredes-Machado was arrested in Mexico, and after U.S. authorities had already been notified of his arrest, he was subjected to physical torture in the form of beating and "water-boarding," and psychological abuse in the form of threats of torture of his wife.  The defense also interviewed Mr. Paredes' wife, who confirmed that she was also physically abused and threatened with rape and other forms of psychological abuse.

The specifics of this abuse are already known to this Court due to the fact that several motions for disclosure on the subject of torture have been litigated. (Doc # 782, and 834.)  The statement of Mr. Paredes-Machado describing his torture is submitted in Spanish as Exhibit B to this Motion, and in English as Exhibit C.  The statement of his wife, Rosa Icela Ponce-Valencia describing her torture is submitted herewith as Exhibit D in Spanish and Exhibit E in English.  A summary of those facts follows.

On Tuesday, January 11, 2011 at approximately 6:00[4] pm, Mr. Paredes-Machado and his wife Rosa Icela Ponce de Paredes were leaving a medical clinic

---

[4]  According to a report in the disclosure of 3/30/17, Mr. Paredes-Machado told DEA agents about a day later that the arrests occurred at about 5:30 p.m. Interestingly, the report by the Mexican authorities implies that the arrests took place some time after 8:45 p.m., leaving out any discussion of the time period during which the torture occurred.

named "Hospital Angeles" in a suburb of Mexico City known as Interlomas.  They

had been at the clinic for Mr. Paredes-Machado to have preliminary testing for

upcoming eye surgery.  As they were walking out of the medical facility toward

their car they were stopped by eight to ten Mexican federal agents who identified

themselves as working with the Subprocuraduría Especializada en Investigación

de Delincuencia Organizada, (SEIDO) which is the organized-crime division of

Mexico's Attorney General's Office.

The officers told Mr. Paredes-Machado that he was being detained due to an

extradition warrant from the United States.  Counsel undersigned has obtained

much of the documentation regarding the arrests, which also indicates that Mr.

Paredes-Machado was being arrested ***solely*** pursuant to an extradition warrant

from the United States in the Eastern District of Michigan.[5]

The defense investigation further indicates that, although it is true that the

_____

[5] See, e.g. Exhibit F, Affidavit of William Sauget in Support of Request for
Extradition (specifying that the reason for the extradition request was the Sixth
Superceding Indictment in this case); and Exhibit G, Recommendation dated
March 11, 2011 by Mexican Deputy Attorney General for International Affairs
Jorge Alberto Lara Rivera to Judge Graciela Malja Aguirre of the Court of
Criminal Matters for the Second Circuit in the Federal District of Mexico for the
Extradition of Marco Paredes-Machado, at pp. 2 - 3 specifying that the
recommendation for extradition was being made because Mr. Paredes-Machado
was the subject of an arrest warrant based on the ***Sixth Superceding Indictment in
case number 03-CR-80244, filed on November 9, 2005 before the Federal
District Court for the Eastern District of Michigan***, United States of America for
charges of conspiring to distribute more than 1000 kilograms of marijuana, and to
import more than 1000 kilograms of marijuana into the United States.

U.S. requests for the arrest and extradition of Mr. Paredes-Machado were officially grounded only on the charges here in Michigan, the DEA also secretly wanted Mr. Paredes-Machado for other conduct. Some of that conduct has resulted in a case in the District of Columbia, opened in 2012, that is now pending under case no. CR-12-237-RJL. The indictment in that case is officially sealed, and Mr. Paredes-Machado has never been brought there for an initial appearance, nor given a copy of the indictment until this Court ordered that a copy be given to the defense in relation to a hearing conducted on February 7, 2018. Although redactions in the indictment prevent the defense from being sure of the names of all of the co-defendants, it is clear that it includes many other people, some of whom are allegedly among the upper echelon of the "Sinaloa Cartel," such as Benjamin Leopoldo Jaramillo-Felix (aka "Nene"), Julian Aguirre-Aguirre (aka "Censio" aka "Chocolate"); and Manuel Avendano (aka "El Meno"). The conduct charged therein allegedly dates as far back as 1998.

It appears that the post-arrest torture and questioning of Mr. Paredes-Machado was based in part on that other conduct. The torture of Mr. Paredes-Machado and his wife by the police resulted in both of them giving statements, which the police edited into a single video.[6]

---

[6] The government had indicated its intention to use this video at trial, but in a letter dated October 31, 2018 to counsel undersigned, now states that it will not seek admission of the video. For that reason the video's admissibility is not

As the Government explained in a 2016 meeting, they believe that the other conduct, upon which Mr. Paredes-Machado is facing charges in Washington DC, included events that took place near the city of Los Cabos, near La Paz, Baja California.  In the video Mr. Paredes-Machado was asked about what business he had in La Paz.  He was also questioned extensively in the video about Joaquin "El Chapo" Guzman, which was a subject of great interest to at least one of the D.C. prosecutors, Mr. Nardozzi, who is prosecuting "Chapo" Guzman in New York.  Mr. Guzman is not a defendant in this case.

Thus, the United States Government was certainly highly interested in what Mr. Paredes-Machado had to say after his arrest, both for the Michigan case, and for others as well.  Given that interest it seems likely that the DEA sent agents from its Mexico City Regional Director location to the PFP[7] headquarters, where the torture took place, immediately after Mr. Paredes-Machado's arrest, if only to ensure that he did not somehow get set free.  The DEA Office in the United States Embassy/Consulate in Mexico City is located less than 10 minutes away from the PFP office.  Yet, the only mention in the disclosure received to date of DEA agents being sent after the arrest is that two agents were dispatched from

_____

challenged here.

[7] "PFP" refers to the Mexican Policia Federal Preventiva, or Federal Preventive Police.  This is a federal police force under the Mexican Secretary of the Interior, sometimes called the "Federales."

9

Hermosillo, Sonora, about 1,000 miles away, and did not arrive until the next day, and spoke with Mr. Paredes-Machado and his wife at SEIDO.

At no time either during the arrest, or thereafter, was Mr. Paredes-Machado told that he was being held on, or investigated for, any Mexican charges.  To the knowledge of counsel undersigned there were no charges pending in Mexico against Mr. Paredes-Machado at the time of the arrest, nor were any charges instituted thereafter.[8]  Thus, his arrest was executed on behalf of the United States government, and based on location information provided by U.S. agents.

Although the people who arrested Mr. Paredes-Machado and his wife identified themselves as SEIDO agents, none of them showed any identification. All of them were dressed in civilian clothing.  The person who was in charge, and with whom Mr. Paredes-Machado spoke, was later referred to as the "comandante."  Mr. Paredes-Machado offered to bribe their way out of the situation, but the comandante told him that it was too late because the American

---

[8]  In the government's disclosure of 3/30/17 there is a mention of a Mexican prosecutor telling two U.S. agents that Mr. Paredes-Machado and his wife were "being held by SEIDO on money laundering charges."  The Mexican Government never prosecuted either of them on any such charges.  On the contrary, Mr. Paredes-Machado and his wife were simply held under Mexican "arraigo" law, which allows a person to be detained without charges for up to 80 days in cases where organized crime is suspected. Rosa Icela was then released.  Mr. Paredes-Machado continued to be detained for extradition.

Embassy had already been notified of their detention.[9]

The agents placed Mr. Paredes-Machado and his wife into different vehicles. Mr. Paredes-Machado was put in the back seat of a four-door Mexican-made vehicle and told to keep his head down so that he could not see where he was being taken. He was not placed in handcuffs or hooded at this time. He was then driven to a location that he knew to be the offices of the PFP (i.e. the "Federales"). From the little Mr. Paredes-Machado could see he was able to recognize the PFP building. The agents transporting him told him they were going to the PFP building, and that he would later be taken to the offices of SEIDO - the agency of the arresting officers.

When they arrived at the PFP building, Mr. Paredes-Machado was escorted in and taken to a room where a black silk pillowcase was placed over his head. His hands were cuffed behind his back. He was told there was an Extradition Warrant from the United States and that he would be held pending extradition. An officer told Mr. Paredes-Machado in a loud voice that he would need to cooperate with the interrogators, and that if he did not answer their questions his wife would be subjected to torture. The phrase they used was "Si no coperaras tu senora le va llevar a la chingada y ahorita vas a ver como va grintar." Roughly translated it

---

[9] This is consistent with the statement in the disclosure of 3/30/17 that Commander Pequeno Garcia notified DEA Assistant Regional Director Carlos Mitchem of Mr. Paredes-Machado's arrest on the same day of the arrest.

means "If you don't cooperate there will be horrible consequences, and soon you will hear how she will scream."

The agents began asking Mr. Paredes-Machado questions about who was in charge of the Agua Prieta, Sonora region or "plaza." Because he was blindfolded he was unable to see who was asking the questions, but it sounded like two to three different persons. The questioners asked which cartel he worked for, and Mr. Paredes-Machado continuously responded that he worked for himself. During the interrogation there were moments of silence where he heard murmuring and could not discern what the interrogators were discussing. In this first room the only violence that he experienced was being slapped on the back of his head, followed by the threat that there would be more severe punishment if he did not cooperate. The threats included statements such as, "Si no hablas por las buenas vas hablar por las malas" (If you don't talk for the good you are going to talk for the bad), meaning that you can cooperate willingly or we will make you cooperate.

The interrogators eventually became frustrated that Mr. Paredes-Machado did not give them the answers they wanted. They told him to stand up and walked him to a second room. During the walk to the second room they kept him bent forward and warned him not to look around. Mr. Paredes-Machado thinks they moved him in this manner so he would not be able to identify the location. He believes it took about 20 steps before they reached the second room.

12

Once there, the door was closed, and Mr. Parades-Machado's shirt was removed.  He does not remember whether they left his pants on or not.  He remained hooded.  An interrogator then punched him several times in the stomach, and he was then thrown to the floor.  He heard one interrogator tell the other "traite la camilla," or "bring the bed."  The bed being referred to was a wooden gurney similar to those used by emergency medical response teams to immobilize an injured person during transport.

Mr. Parades-Machado was placed on the gurney face-up with his hands cuffed behind his back, and his feet were tied to the gurney.  One of the interrogators then sat on his legs. With his body completely immobile, he was unable to resist while the officers prepared to waterboard him.  He then felt someone jam a knee into his stomach causing him to expel all of the air out of his lungs.  Simultaneously, another interrogator poured water over the hood into his mouth, causing Mr. Parades-Machado to involuntarily swallow and inhale water and experience the sensation of drowning.

Periodically the application of water would stop, and the interrogator would ask the same questions that were asked in the first room.  When Mr. Parades-Machado refused to answer the questions, he again felt the knee to his stomach and water being poured onto the cloth and into his mouth, again causing him to choke and drown.  He was told that this procedure would be repeated until he

13

provided the requested answers.  While he was being interrogated, the officers told

him that his wife was undergoing the same type of treatment, and if he decided to

cooperate they would stop torturing her.

After perhaps the seventh or eighth repetition of the water torture, Mr.

Paredes-Machado heard the lead interrogator tell someone to bring the barrel of

water.  Mr. Paredes-Machado then believed that he was going to be put head-first

into a barrel of water.  He was then removed from the wooden gurney, still with

the hood over his head, and made to sit on a chair.  Officers told him again that his

wife was being interrogated in the same fashion and he could stop her suffering by

cooperating.  At this point he believed that both he and his wife would be killed if

he did not cooperate.

Mr. Paredes-Machado then agreed to tell the interrogators what they wanted

to hear.[10]  As he was seated in the chair he began to feel a sensation of relaxation

and calmness almost like he was floating in the clouds.  He thinks the interrogators

may have put a drug into the water they were pouring into his mouth.  As he sat in

---

[10]  Lest one think Mr. Paredes-Machado's torture did not last very long, it is important to note that CIA officers who subjected themselves to water-boarding endured an average of but 14 seconds before capitulating – and they were not facing death or the torture of their wives.  Interrogating officers have reported that al Qaeda's toughest prisoner, Khalid Sheik Mohammed, won the admiration of interrogators when he was able to endure waterboarding for almost two-and-a-half minutes before begging to confess. Ross, Brian; Richard Esposito ABC News (18 November 2005). "CIA's Harsh Interrogation Techniques Described."  Available at http://abcnews.go.com/WNT/Investigation/story?id=1322866.

the chair he thought about his wife being tortured he believed it was up to him to save her.

The interrogators told Mr. Paredes-Machado all they wanted was for him to cooperate, and began to give him the names of people they wanted him to talk about. They told him they wanted to know about Chapo Guzman, Arturo Beltran, Juan Esparagoza (both father and son), Hector Beltran, Tony Beltran, and "Gio," among others. He was also told that he would have to say he was present at a gathering of drug-Cartel leaders in Cuernavaca. He capitulated. The torture left some physical scars on Mr. Paredes-Machado. His left wrist is still scarred to this day from the handcuffs, which cut into his wrist when he tried to resist the drowning effect of the waterboarding.

After rehearsing the questions and answers, he was told to put a shirt on and was placed in front of a video camera. Mr. Paredes-Machado recalls being in front of the video camera but remembers little about the questions or his responses. He remembers that the interrogators stopped the video two or three times to repeat the questions and make him give more acceptable answers. During the recording, if Mr. Paredes-Machado made a mistake, one of the interrogators would slap him on the back of his head. The recording was then restarted from the beginning.

After the video was done Mr. Paredes-Machado was taken to give a written statement. Mexican government records obtained by counsel undersigned reflect

15

that by 2:30 a.m on January 12, 2011, Mr. Paredes-Machado had been brought

before an attorney of the special money-laundering unit mentioned above[11] by

Mexican federal police officers Diana Elizabeth Gonzalez Garcia and Jorge

Adrian Hernandez Castro of the SSP.  There, Mr. Paredes-Machado was

questioned by yet another official, Paola Montserrat Amador Hernandez, at length

about his family, properties, and other subjects.  This time he gave a signed written

13-page statement.  Several of the properties about which he was questioned were

the same ones as listed in the letter sent by Mr. Evans of the United States

Embassy about a month before Mr. Paredes-Machado's arrest.  In addition, he was

asked whether he was acquainted with eighteen different people, first among

whom was Allen Ozdemir, a co-defendant in this case, who was not charged in

Mexico and had been out of prison for more than a year at the time.  Also on the

list was Luis Renato Urtusuastegui, who is now charged as a co-defendant of Mr.

Paredes-Machado in the District of Columbia case discussed above.

  Mr. Paredes-Machado believes he was held at the PFP building for five to

ten hours before being transported to SEIDO on Wednesday morning.  The person

who transported him was the "comandante" of the group that arrested Mr. Paredes-

---

[11] This unit is called the "Ministerio Publico de la Federacion Adscrita a la
Unidad Especializada en Investigacion de Operaciones con Recursos de
Procedencia Ilicita y de Falsificacion o Alteracion de Moneda," (Public Ministry
of the Federation Attached to the Specialized Unit in the Investigation of Illicit
Proceeds and Counterfeiting or Currency Alteration.)

Machado and his wife outside the hospital.  When they arrived at the SEIDO

building the "comandante" signed the booking form with the name of  "Jorge

Hernandez."

On Thursday Mr. Paredes-Machado was moved from the detention cell on

the basement floor of the SEIDO building to an upper floor.  There he was

interviewed by three Americans.  They were identified as DEA agents, one from

Detroit, another from Sierra Vista, Arizona, and the third from Hermosillo,

Sonora.[12]  The Hermosillo DEA agent spoke with Mr. Paredes-Machado in

Spanish.  The others did not appear to speak Spanish.  The thrust of the interview

with the Hermosillo agent was that the Americans wanted Mr. Paredes-Machado

to cooperate with the government against "El Chapo," which he declined to do.

The conversation lasted only a few minutes.

According to the Government's disclosure of 3/30/17, the conversation

lasted 15 minutes.  There is no mention of any warnings being given pursuant to

Miranda  v. Arizona, 384 U.S. 436 (1966).  The report does, however, contain this

telling recitation of Mr. Paredes-Machado's fearful demeanor during those 15

minutes:

During the course of the interview, PAREDES Machado ***seemed***

_____

[12]  A DEA-6 report in the disclosure of 3/30/17 indicates that the three men
were Special Agents Jonathon Shankweiler, Christopher S. Thompson and
Michael T. Garcia.

> ***apprehensive*** about answering questions.  SA Thompson asked
> Paredes Machado if he did not want to answer questions, to which he
> replied "not here."  SA Thompson explained to PAREDES Machado
> that he was a wanted federal fugitive and extradition had been
> requested by the United States Government.  When asked what he
> thought about that, PAREDES Machado replied "me quierro ir para
> alla."  (***I want to go there***).  At approximately 12:45 PM, PAREDES
> Machado ***indicated fear of answering questions in the SIEDO office***
> and requested termination of the interview.

(1-19-2011 Report of SA Christopher Thompson at 3, 5, <u>emphasis added</u>).

The medical report included in the Government's disclosure of 4/6/17

indicates that when Mr. Paredes-Machado was medically examined by a medical

officer of the Mexican Attorney General's Office at 6 a.m on January 12, 2011

(approximately 12 hours after the arrests), he had several linear wounds (described

as "excoriations") on the backs of his hands and on his wrists.  The report

concludes, "MARCO ANTONIO PAREDES MACHADO has wounds that are not

life-threatening and will heal in less than 15 days."

The January 12, 2011 report of Mexican police officers Jorge Adrian

Hernandez Castro and Diana Elizabeth Gonzalez Garcia in the Government's

disclosure of 4/6/17 says nothing about the time period between 5:30 p.m. and

8:45 p.m. on the evening of the arrest (when the torture occurred).  Instead, as

noted above, it implies that the arrests took place sometime after 8:45pm:

> On January 11, 2011 at approximately 20:45, federal police officers
> Jorge Adrian Hernandez Castro and Diana Elizabeth Gonzalez Garcia
> worked on the assignment given to them by the Federal Prosecutor's

office and based on information obtained from sources, the police
officers learned that PAREDES MACHADO and PONCE
VALENCIA were going to be at the hospital "Hospital Angeles,
Lomas." . . . [After observing, detaining, and identifying Mr. Paredes
Machado and his wife] . . .  We let them both know they were wanted
by law enforcement authorities and that there was a localization and
presentation warrant against them. After that, we told them they were
going to be taken to SEIDO.  They voluntarily acceded to come with
us.

This statement, saying that "on January 11, 2011, at approximately 20:45"

(8:45 p.m.) officers Hernandez and Gonzalez "worked on the assignment given to

them by the Federal Prosecutor's Office" is in contradiction to the statement Mr.

Paredes-Machado made to DEA agents when they interviewed him two days later

that he was arrested at 5:30 p.m.  It also conveniently "erases" more than three

hours of custody, during which Mr. Paredes-Machado and his wife were being

tortured and physically abused, not at SEIDO, but at the PFP headquarters.  The

Court can use its own judgment as to the likelihood of a doctor appointment

ending at around 8:30 p.m.


E.     The Arrest and Torture of Mr. Paredes-Machado's wife.

Mr. Paredes-Machado's wife, Rosa Icela Ponce de Paredes, also suffered

physical and psychological abuse following her arrest.  The following facts are

distilled from her statement, appended hereto in Spanish and English as Exhibits D

and E.

19

Rosa Icela Ponce de Paredes recalls that, as she and her husband were leaving the Interlomas hospital, they were approached by several law enforcement officials wearing blue pants, white shirts, and identification badges hanging from their necks. They asked Mr. Paredes-Machado for his name and he gave them an alias – Hector Ariel Rosas. Not believing that he was Hector Ariel Rosas, the officers told Marco and Rosa Icela they were being taken into custody.[13] Rosa Icela was placed in the back of an unmarked police vehicle and her head was covered with a jacket. She was told to bend forward to keep her from being able to see where they were taking her. Rosa Icela estimated that the drive took approximately one hour.

When the drive was over she was taken into a building, and made to sit in a chair with her hands handcuffed behind her. The cloth that was over her face was removed and a feminine napkin was put over her eyes along with another covering. Interrogators began asking Rosa Icela questions about the person who accompanied her, believing that he was using was a false name. They called her a whore and other demeaning names. They threatened to place drugs, dynamite, and guns in Rosa Icela's car if she did not cooperate. Rosa Icela then admitted that her

---

[13] Mr. Paredes-Machado later explained in his interrogation that he used a false name to evade being located by "Dos Mil," a violent drug lord who had already assassinated two of Mr. Paredes-Machado's brothers and his sister, and who was searching for him.

companion was Marco Paredes, her husband, and that he was using the false name Hector Ariel Rosas.  They then told her that if she did not cooperate on other areas of investigation they would remove her clothes.  She feared this meant they would rape her.  When she told them she could not help them because she did not know anything about Marco's businesses, they yanked violently on her hair, pulling her backwards.  They pulled so fiercely that for months she felt the pain just at a touch the back of her head.   Her hair was pulled that way 4 to 5 times during the questioning.  The interrogators slapped her on the face several times as well.

Rosa Icela's interrogation lasted approximately 30 minutes.  Some time after it stopped, with her eyes still blindfolded, Rosa heard a person approach from behind and a female voice said to let the female know if the interrogators continued to hit her.  Rosa was unable to see the face of this female.  After this, Rosa was left seated in the room with an unknown person.  She asked to use the bathroom and was walked there, still blindfolded.  Rosa Icela was later transferred from the first interrogation room to another room.  There, she was questioned about Ninel Conde and Juan Zepeda, who were friends of Marco.  The interrogators wanted to know if Juan Zepeda stored money for Marco.

She was subsequently placed before a camera to be video recorded.  During the recording she answered the questions asked of her because she believed that if she refused she would be subjected to more violence.  After completing the video

21

she was led down a corridor back to the interrogation room.  On the way, she saw her husband Marco being escorted toward her.  He was leaning forward and his face appeared wet, as though he had just stepped out of the shower.  Marco was holding onto his belt, which was unfastened, and attempting to hold up his pants.

After some time Rosa Icela was taken to the SEIDO building.  She believes her husband Marco was in the same van that transported her.  At SEIDO she again saw Marco, and observed what she believed to be blood on his wrist.  At SEIDO a declaration was taken from Rosa Icela about whether she knew certain people. She was then taken to another room, where she was told to read from a script.[14] Thereafter she was placed in a holding cell.

At some point officers removed Rosa Icela from the cell and took her to a conference room at SEIDO where there were she saw three men dressed in suits She believes them to have been federal agents from the United States.  They identified themselves as being from the U.S. Embassy.[15]  The men asked about

_____

[14]  Mexican government records obtained by counsel undersigned show that Rosa Icela, like her husband, was taken before an agent from the special money laundering unit and questioned.  Her interrogation took place around 7:15 a.m. She was questioned about whether she knew certain specific people, among whom again was Mr. Allen Ozdemir, a defendant in this case, as well as other drug traffickers.  She, like her husband, signed a written statement.  Hers was 16 pages long.

[15]  The Government's 3/30/17 disclosure states that the same three DEA agents (Shankweiler, Thompson and Garcia) interviewed Rosa Icela Ponce Valencia at 1:20 p.m. in the SEIDO offices.

Marco and his brother Rodolfo, and the legal problems Rodolfo had in the United States.  One of the men refused to look at Rosa Icela and kept his back to her the entire time.  The other two agents faced her and spoke in English to the man with his back turned.  Rosa Icela was then returned to the holding cell, and subsequently taken to a half-way house where she was held under the "Ariago" law.

      F.    <u>The Video in the Government's Disclosure</u>.

As noted above, the Government's disclosure in this matter includes a video "statement" by Mr. Paredes-Machado and his wife.  The recording begins without introduction except a title screen bearing the words "SSP" and "Policia Federal." Following that the words "Detenidos Marco Antonio Paredes Machado y Rosa Icela Ponce Valencia" are displayed against a black background.  There is no explanation of why Mr. Paredes-Machado and his wife were giving the statements, whether they were being given voluntarily, whether they had been given <u>Miranda</u> warnings, or why the subjects were giving information against their own penal interests.

Mr. Paredes-Machado's interrogation appears first on the video.  It lasts approximately 23 minutes.  It begins abruptly with an unidentified and unseen

23

male questioning Mr. Paredes-Machado in Spanish, in a calm but firm voice,

starting with his name, and then proceeding to pepper him with questions in the

same calm but authoritative manner.  Mr.

Paredes-Machado is seen standing in front of

a background with several badge-like stars on

it with the words "SSP" and "Policia Federal"

in them, along with a logo of some kind.  In

several other places on the background are



the words "SSP" and "Secretaria de Seguridad Publica"  Along the sides are

markings of height in meters.  Mr. Paredes Machado is seen only from the

shoulders and up.  He is wearing an olive-green shirt with military-style shoulder

straps, and a white undershirt.  His clothing and hair are dry, but his hair appears

uncombed.

In the video Mr. Paredes-Machado is questioned in a staccato manner, and

there do not appear to be any interruptions in the recording.  After several

questions of a biographical nature (name, birth date, address etc.) the questions

turned to the marijuana business.  Although his answers to those questions were

incriminating, he responded to each question immediately and without protest.  He

appears to have had a dry mouth, licking his lips repeatedly and wiping his mouth

several times with a handkerchief.  From time to time he glances nervously to his

24

left, and occasionally the voices of other people can be heard in the background. He burps several times during the interview.

The questions Mr. Paredes-Machado answered included where he did business, with whom, how much, and what other associates he knew or worked with in the past. He was specifically asked about high-level drug traffickers such as "El Chapo," "El Dos Mil" and others. He was also questioned at length about financial matters, including what properties and vehicles he owned. The activities of other members of his family and his travels were also discussed. His interview ends abruptly without explanation, with a dissolve transition to a his wife, Rosa Icela. This dissolve is an indication that the two separate videos were joined together using video editing software. Whether any other editing was done is not known to the defense. The official DEA reports describe that video recording as having been made by the "SSP/SIU." And, indeed, the video file appears to have



been finalized at 11:51 p.m. on January 11, 2011, at which time Mr. Paredes-Machado and his wife were still in the custody of Officers Hernandez Castro and Gonzalez Garcia[16]

Again, there is no introduction to Rosa Icela's

---

[16]  Testimony of Officers Hernandez Castro and Gonzalez Garcia at deposition taken on November 29, 2017 in Mexico City, pursuant to this Court's order.  (Doc. # 827.)

interrogation and no discussion of why she was making the statement.  She is seen

wearing a purple blouse, and is also pictured from the shoulders and up.  She

stands before the same background as did Mr. Paredes-Machado, with height

markings, badge-like stars, and the words "SSP," "Policia Federal" and "Secretaria

de Seguridad Publica."  Like her husband, Rosa Icela was questioned in a calm but

insistent manner by an authoritative man who sounds like the same man who

questioned her husband.  After biographical questions the interrogator turned to

her husband's occupation, what properties she owns, what bank accounts she has,

the activities of her children, her other family members and acquaintances and her

travels.  Like her husband, she answered each question immediately, earnestly and

without protest, although she appeared worried at various points.  Her

interrogation lasted approximately 10 minutes.

Importantly, there is no indication in the video statements that Mr. Paredes-

Machado and his wife were speaking voluntarily.  Common sense dictates that

they were not.  A person who is taken to the Organized Crime Unit of the Mexican

Attorney General's Office does not just volunteer to admit to serious crimes on a

video recording simply for the fun of it.  Obviously these people were compelled

by something to make these statements.  What compelled them was the physical

and psychological brutality and threats to which they had been subjected in the

previous few hours.

After these events Mr. Paredes-Machado was held in Mexican prison facilities for several years awaiting extradition to the United States. His Initial Appearance and Arraignment in this Court took place on September 10, 2015, almost five years after his January 11, 2011 arrest.

G.    Defense Requests for Disclosure.

Based on those statements, the defense formally requested disclosure from the Government on March 31, 2016 regarding several subjects, among which was the subject of what physical, psychological and other forms of torture or abuse Mr. Paredes-Machado, his wife and any other people involved in this case were subjected to. There followed extensive correspondence, and eventually litigation by the defense, attempting to secure further disclosure from the Government. (Doc. #782, 795, 798.) The Government did disclose a few other documents, but in general it refused to provide the bulk of the materials the defense requested.

On June 19, 2017 Magistrate Judge Grand conducted a hearing on the defense motion for further disclosure. At that hearing the defense introduced as Exhibit A to that hearing, a printout from the official DEA website entitled Drug Enforcement Administration International Operations, Chapter 3 (2007). (RT 6/19/2017, doc. # 832, at 9, 49.) It contains information about police units composed of DEA agents and law enforcement officers of a foreign countries

27

called Sensitive Investigative Units (hereinafter "SIUs").  A printout of that article is attached to this Motion as Exhibit H, and the article can be found on the Department of Justice website for the Office of the Inspector General at https://oig.justice.gov/reports/DEA/a0719/ chapter3.htm.  Also filed at the hearing were Defense Exhibits B and C to that hearing, which are DEA reports indicating that Mr. Paredes-Machado and his wife were in fact arrested by an SIU.  Those reports are filed with this Motion as Exhibits I and J.

That OIG website states that the SIU program is an official DEA program, with offices established in foreign countries as designated by Congress.  (Exh. H at 1.)  The SIUs themselves are teams of law enforcement officers of the host country (in this case, Mexico) that are specially vetted by the DEA, polygraphed, and drug-tested in an effort to ensure that they will not disclose secret information. (Id.)  Those officers who are admitted to the program are sent to a five-week DEA training academy in Quantico, Virginia, accompanied by DEA advisors.  (Id. at 1, 6.)

When they return to their home country, the officer is assigned to an SIU, which is supervised by a senior officer of that country, but with at least one DEA Special Agent providing general oversight at each location.  (Id. at 1, 5.) Guidelines issued in September 2005 required that the DEA Special Agent advisor to SIU-member ratio be no more than 1 advisor to 15 SIU members.  (Id. at 3,5.)

The DEA advisor is responsible for overseeing the SIU's activity by maintaining contact with the SIU commander through information sharing, planning, and monitoring the status of equipment issued to the unit.  (Id. at 5)  In the case of Mexico, the article states that in 2006 there were 21 DEA advisors for 184 SIU members, and thus one DEA supervisor per 8.8 Mexican SIU members.   (Id., table.)  In short, DEA special agents closely supervise their Mexican SIU officers.

The DEA supplies extensive funding to the SIUs, including payments for operation-related costs (such as travel expenses) and equipment for SIUs to use during investigative activities.  (Id. at 1, 6.)  The DEA also pays SIU members money, sometimes in cash, to supplement the salaries they receive from their home country.  (Id. at 5 .) The Government has repeatedly refused to disclose to the defense the amounts of funding provided after multiple requests.  We do know from the Government's own disclosure that agents provided cash funding to the SIU in this matter alone at least three times and probably many more times to facilitate so-called "intel T-III" wiretaps.  The first known time was on August 30, 2010, when Special Agent Thompson and Assistant Regional Director Carlos Mitchem met with the above-mentioned Commander Ramon Eduardo Pequeno Garcia and paid him an unspecified amount of money for "operational expenses."[17]

---

[17]  Report by SA Christopher Thompson, dated 9-7-2010 at p. , ¶2, attached hereto as Exhibit K.)

The second known payment to the SIU was on September 24, 2010, when an Agt. Cabrera delivered funds to ths SIU.[18]  The third was  December 14, 2010.[19]  Despite these official DEA reports, however, the Government submitted a declaration in this case by its case agent stating that he had spoken with Agt. Garcia who "stated he was unaware of any funding provided by the U.S. government to the Mexican government for investigating Paredes-Machado, including, but not limited to, funding any so-called "intel" T-IIIs."

The amounts paid in these three transactions have never been disclosed to the defense, despite repeated requests.  There is, however, one DEA memorandum dated January 25, 2011, which states that a $3,000 payment made to the SIU was initially drawn out on a DEA-12 form under one case number, but was used by the SIU for investigation in a different case number.  The defense has specifically requested the DEA-12 forms (which document payments from the DEA to the SIU) but the Government has disclosed none.  Thus, the defense cannot be sure how many other payments were made that have not been disclosed by the

---

[18]   Report by SA Michael Garcia, dated 01-21-2011 at p. 2, ¶6, attached hereto as Exhibit I .)

[19]  There are two reports concerning that date.  One lists Agents Gregory Donovan and Mirelli Cabrera as meeting with SIU officers in and Mexico City to provide funds for continuing "intel T-III" wiretapping.  A second report states that on the same day agents Cabrera and Garcia submitted paperwork and funding to the SIU

government, nor the amounts of the payments.

Counsel undersigned is filing contemporaneously herewith yet another motion for expanded disclosure. The defense has already litigated several motions for further disclosure, receiving rulings favorable to the defense. (Doc. # 782, 803, 834, 845, 847, 854.) However, in each case the Government has failed to comply with the spirit of those orders, in one case submitting a declaration by its case agent that contained several false statements. (See Doc. 854 and sealed order dated 8/23/18.) The Government now appears to have once again violated the spirit of the Court's Order, this time the August 23, 2018 Order, by failing to disclose documents, as discussed in more detail in the accompanying motion.

In any event, from the information disclosed to date, the amount of money given to the SSP/SIU in Mexico City appears to be substantial. Three known payments in this case alone are set forth above, one of which appears to have been for $3,000. Given the Government's refusal to disclose the DEA-12 forms and other documents that have been requested, the defense can only say that this appears to be just the tip of a very large iceberg.

In short, the Mexico City SSP/SIU that tortured Mr. Paredes-Machado and his wife is essentially a subsidiary of the U.S. Government. The officers are trained in Quantico Virginia, they are supervised by DEA agents, they are furnished by the U.S. Government with both equipment and intelligence as to

31

assets they can seize and what phone numbers to intercept, and they are directly funded in large part by the United States Treasury, including payments to the highest ranking members.

During the hearing on the defense motion for further disclosure the Government notified Magistrate Judge Grand that it had submitted a request to Mexico under the Mutual Legal Assistance Treaty (MLAT) to interview the Mexican police officers involved in the arrest.  (RT[20] 6/19/2017, doc. # 832, at 30.)  Based on this assertion, and other statements by the Government concerning the steps it would take to obtain some of the materials requested by the defense (RT 6/19/2017, doc. # 832, at 41-42, 47-48), Judge Grand ruled that it was most prudent at that juncture to deny further disclosure, without prejudice, to permit the Government to follow through on its promised efforts to obtain further information sought by the defense.  (Doc # 803).

Thereafter the Government of Mexico agreed to make available for depositions under the MLAT two of the Mexican police officers who arrested Mr. Paredes-Machado and his wife, and the doctor who examined Mr. Paredes-Machado the next morning.  The depositions were conducted on November 29, 2017 in Mexico City.

---

[20]  The abbreviation "RT" is used herein to refer to "Reporter's Transcripts" of various hearings.

Three persons were deposed.  The first was Dr. Jose Antonio Viveros Orozco, the doctor who examined Mr. Paredes-Machado at 2:40 a.m. on the morning after the arrests.   The second person deposed was Deputy Officer Diana Elizabeth Gonzalez Garcia, the female officer who was primarily in charge of handling Mr. Paredes-Machado's wife, Rosa Icela.  The last person deposed was Deputy Officer Jorge Adrian Hernandez Castro, whom Mr. Paredes-Machado remembers as the "Comandante," in charge of the overall operation.  The transcripts of these depositions are filed with this Motion as Exhibits M (deposition of Dr. Viveros Orozco), N (deposition of Ofc. Gonzalez Garcia) and O (deposition of Ofc. Hernandez Castro).

These depositions, however, were functionally useless for several reasons. The first is that they were conducted under Mexican procedural rules, which did not allow for leading questions.[21]  Nor was a witness allowed to physically demonstrate things not in his report.  (Exhibit M at 19.)  It is well settled that effective examination of hostile witnesses requires the use of leading questions

---

[21]  Ms. Maria Elizabeth Altamira Flores, Adjunct Director for Judicial Assistance in Mexico appeared on behalf of the witnesses and objected numerous times to questions she deemed as "leading."  (Exhibit M at 21, 22, 25; Exhibit N at 28, 33; Exhibit O at 24, 27, 28.)  Ms. Altamira stated, "According to Mexico Law, those questions can be objected, because in this country, you cannot ask conducive questions – inductive questions."  (Exhibit M at 21.)  When defense counsel stated that the objection would be noted for the record, but the witness would be asked to answer, Ms. Altamira repeated her objection and forced counsel to re-phrase his question so it would not be leading.  Id.

and further explication of information that a witness chooses not to put in his

report.  See e.g. Fed. R. Evid. 611(c) (permitting leading questions upon cross

examination or with hostile witnesses).  Thus, through the Mexican Government's

dogged protection of these officers from leading questions and penetrating

examination, effective interrogation was greatly restricted and valid examination

of hostile witnesses was effectively precluded.  Essentially, counsel was only

allowed to elicit from the witnesses what was already in their reports.

These restrictions allowed at least one witness, Ofc. Hernandez Castro, to

make numerous obviously-false statements without contradiction or effective

impeachment.  One example was whether he was part of an SIU.  The DEA-6

Reports disclosed by the Government make it clear that the Paredes-Machado

arrests were made by an "SIU" – a Sensitive Investigative Unit.[22]  Ofc. Diana

Elizabeth Gonzalez Garcia admitted that she was part of the SIU as well:

> Q:    And are you specifically assigned to the SIU, Special Investigations
>       Unit, Otherwise known as SEIDO?

---

[22] E.g. "*A detachment of SSP/SIU personnel* were deployed to the location and *arrested PAREDES and his wife* without incident."  Report of DEA Agt. Michael Garcia dated 1/21/2011 at 3, emphasis added.  (The "SSP" refers to the "Secretaría de Seguridad Pública, or Secretariat of Public Security, headquartered in Mexico City, once a part of the Mexican Federal Cabinet, but dissolved in 2013.)  See also Report of Agt. C.S. Thompson dated 1/19/2011 at 9, 10 discussing items seized from Mr. Paredes-Machado as a result of "*his arrest by SSP SIU* in Mexico City, Mexico, on January 11, 2011," and information disclosed to the DEA *by the SSP/SIU* about statements that Mr. Paredes-Machado made *upon his arrest*.  (Emphasis added.)

A:     Yes.

(Exhibit N at 13.)  And both Ofc. Gonzalez Garcia and Ofc. Hernandez Castro

agreed that they were "partners."  (Exhibit N at 19, 25; Exhibit O at 19, 29.)   Yet

Ofc. Hernandez Castro feigned ignorance when asked whether he was part of an

"SIU."  (Exhibit O at 17-18.)  He later admitted to having been part of an unnamed

special unit within the antidrug division, but testified that at the time of these

arrests he was no longer part of an SIU.  (Id. at 19.)

Likewise, Ofc. Hernandez testified that he was not in charge of the arrest

operation, although the female officer, Diana Elizabeth Gonzalez Garcia, admitted

that he was her "superior," (Exhibit N at 25), and Mr. Hernandez Castro stated that

others informally called him "Comandante."  (Exhibit O at 15-16.)  One wonders

how Mr. Hernandez Castro could have been the partner and supervisor of an

officer in the Special Investigation Unit that arrested Mr. Paredes-Machado, and

yet not be a member of the SIU himself.

Officers Gonzalez Garcia and Hernandez Castro also stated that Mr.

Paredes-Machado was not handcuffed when he was arrested or transported.

(Exhibit N at 16, 37; Exhibit O at 12, 25.)  However, a medical examination

conducted within minutes of his leaving these officers' custody disclosed wounds

on Mr. Paredes-Machado's wrists that obviously came from handcuffs, or

something like them.  The report states the following findings:

Two parallel and linear excoriations. The first one is five centimeters long and the second is three centimeters long. Both are located on the back of his right hand. Another linear excoriation, nine centimeters long, is on the back of his left hand. One six-centimeter linear excoriation is on the front side, distal third, of left forearm. One seven-centimeter linear excoriation is on the front side, distal third, of right forearm. Yellow ecchymosis (4 x 3 centimeters), located in the second intercostal space above the right mid-clavicular line.

(Exhibit P to this Motion, Report of Dr. Jose Antonio Viveros Orozco dated

January 12, 2011, at 2:20 a.m. at SEIDO.)

As this medical report establishes, Mr. Paredes-Machado had two linear cuts

parallel to each other on the back of his right hand, one about two inches long and

the other about one inch long.  A cut about three and a half inches long, was

present on the back of his left hand, and on the front of his left wrist was a cut

almost two-and-a-half inches long.  That two-and-a-half-inch cut to his left wrist

was so severe that Mr. Paredes-Machado still bears the scar from it to this day.

Lest there be any confusion that these might have been be old wounds, a report by

Dr. Mauro Cabrillo Castillo the next day (January 13) described these as "costra

seca" (dried scabs) with ecchymosis (brusing) on the left hand.  (Exhibit  Q to this

Motion, Report of Dr. Mauro Cabrillo Castillo Dated January 13, 2011.)  In his

deposition, Dr. Viveros Orozco admitted that these were fresh lacerations,

inflicted just hours before the examination, which occurred at 2:40 a.m.  (Exhibit

M at 13, 20.)  Officers Gonzales Garcia and Hernandez Castro explicitly stated

that Mr. Paredes-Machado was never out of their custody during that time.

(Exhibit N at 16, 22; Exhibit O at 25.)

Common sense says these "dried scabs" were precisely the kind of wounds that would have resulted from a struggle against handcuffs while being tortured. Mr. Paredes-Machado says that is exactly what they were.  (See Exhibit  C at ¶ 19.)  In addition, the examination by Dr. Cabrillo Castillo found a small dry scab on his left gluteus, "apparently from scratching."[23]  This fits with Mr. Paredes-Machado's description of his struggle against handcuffs behind his back while being water-boarded face-up, during which his captors jammed a knee into his stomach to make him inhale water into his lungs.

The most important of these officers' many blatant falsehoods during the depositions concerns the time during which Mr. Paredes-Machado and his wife were tortured and then interrogated on video.  Both officers admit that Mr. Paredes-Machado and his wife were in their custody at the relevant times, but they claimed that neither prisoner was questioned and no video was made while they had custody of these folks.  (Exhibit N at 22, 39-40; Exhibit O at  27-29.)  The

---

[23]  See Exhibit  Q to this Motion, Report by Dr. Mauro Cabrillo Castillo dated January 13, 2011, at p.1, finding: "costra seca de cero punto cinco centímetros en glúteo izquierdo al parecer por rascado," or "dry scab of 0.5 centimeters on left gluteus apparently from scratching."

officers testified that they made the arrests near Hospital Angeles[24] at around 8:45

p.m.[25]  (Exhibit N at 13, 15, 16, 22, 31; Exhibit O at 10, 14.)  The officers further

testified that they took the captives directly to the offices of SEIDO

(Subprocuraduria Especializada en Investigacion de Delincuencia Organizada, or

Attorney General's Specialized Organized Crime Investigation Unit.)  (Exhibit N

at 14-15, 31, 36; Exhibit O at 11-12, 17, 25.)

SEIDO is only about a dozen miles away from the hospital in the downtown

area.[26]  Driving time for that trip should be about 50 minutes to one hour.  Yet the

officers stated that they arrived at SEIDO around midnight, more than three hours

after the arrests.[27]   The officers claimed that it was "rush-hour," and traffic was

heavy, but it defies belief that at 9 p.m. on an ordinary Tuesday night a 50 minute

trip required anywhere near three hours.  Their claim that there was no other stop

is simply not credible.

---

[24]  (Exhibit N at 14.)  The address of Hospital Angeles is Vialidad de la
Barranca No. 22, Col. Valle de las Palmas. C.P. 52763, Huixquilucan,
Estado de Mexico. (See Exhibit R, infra, at p.1.)

[25]  Both Mr. Paredes-Machado and his wife say they were actually arrested
around 6:00 p.m.  See Exhibit C at ¶ 3 and Exhibit E at ¶ 3.

[26]   SEIDO is located at Paseo de la Reforma 75, Guerrero, 06300 Ciudad de
México, CDMX, Mexico.  (Exhibit N at 15).

[27]  A contemporaneous document indicates that they actually may have
arrived at 2:00 a.m., some five hours later.  (See Exhibit  S to this Motion,
Evidence Sheets, listing arrival time of 2:00 a.m. January 12, 2011.)

Even more disturbing is the officers' testimony regarding the video interrogation of Mr. Paredes-Machado and his wife.  The official DEA reports describe that video recording as having been made by the "SSP/SIU."[28]  And, indeed, the video file appears to have been finalized at 11:51 p.m.[29] on January 11, 2011, at which time Mr. Paredes-Machado and his wife were still in the custody of Officers Hernandez Castro and Gonzalez Garcia, according to their own testimony.

The video was created by combining two separate videos, one of Mr. Paredes-Machado and one of his wife, Rosa Icela.  (Exhibit  T at ¶6.)   The process of splicing them together probably began at 11:36 p.m and was completed at 11:51 p.m. Mexico City time. (Id. at ¶ 12.)   That process had to have begun after the filming of the component video interrogations themselves was concluded.  The video of Mr. Paredes-Machado's interrogation is about 23 minutes long, and his wife's video lasts about 10 minutes.  Thus, even if they were completed in a single

---

[28]  Report of Special Agt. Michael Garcia dated 2/16/11, which states, "Following the arrests, ***SSP/SIU conducted a recorded interview*** with PAREDES, as well as his wife. SSP/SIU provided DEA MCCO with a copy of the taped interviews." (Emphasis added.)

[29]  See Exhibit T  to this Motion, Affidavit of computer forensic expert Brian Chase.

"take" (which they were not)[30] the interrogations had to have begun well before the editing process started at 11:36 p.m. – i.e. somewhere around 11:00 p.m. or perhaps earlier.

But the testimony of both of these officers was that Mr. Paredes-Machado and his wife were never out of their custody from 8:45 p.m. to midnight, and no video was made during that time.  That testimony was obviously false, as shown by the data on the computer file released by the Government.  That video was made between 11 and 11:51 p.m. that night – a time when both officers swore Mr. Paredes Machado was in their custody.

It is also obvious why the officers would want to make this facially absurd denial: no prisoner would make such an inculpatory statement, admitting crimes on video, unless coerced to do so.  Thus, the video itself is evidence of their coercion, which in this case was water-boarding, beating and extensive physical and psychological abuse.  In short, it is clear that these police officers testified falsely.  The torture did occur, as Mr. Paredes-Machado and his wife have alleged.

E.    Renewed Disclosure Request

After the depositions the defense filed a Renewed Motion for disclosure on

---

[30] Mr. Paredes-Machado's interrogation was stopped and re-started several times.  See Exhibit C to this Motion at ¶ 16.

December 28, 2017.  (Doc. #834.)  That motion contended that the depositions had been functionally useless because the witnesses testified falsely to several crucial facts, and were able to do so with impunity due to the procedural rules under which the depositions were conducted.

The defense pointed out that United States Government's files must still contain numerous pertinent documents relating to the SIU that made these arrests, none of which have been disclosed to the defense, even though the defense has presented a *prima facie* case for disclosure.  The Government filed its Response on January 19, 2018 (doc. #838) and the defense filed a Reply on January 25, 2018. (Doc. # 839.)  The matter came on for a hearing before Magistrate Judge Grand on May 8, 2018.

After that hearing Judge Grand ordered that the Government take additional steps to search for information concerning Mr. Paredes-Machado's arrest, and to disclose certain specific items that it finds to the defense.  (Doc. # 847 at 18-21.) A few weeks later the Government filed a declaration by its case agent, supposedly showing that it had taken the required steps and had found no new information.  (Doc. 849.)   After reviewing that declaration, the defense moved for an evidentiary hearing on the grounds that the declaration contained at least one statement that was demonstrably false, and several other statements that were misleading to varying degrees and showed a lack of due diligence on the part of

41

the Government in complying with the Court's order.  (Doc. 854.)

The Government Responded by stating that the case agent was "mistaken" in putting the false information in his declaration, but it offered no explanation as to how the false the assertion could have been a mere mistake when it was supposedly based on statements by several other agents, all of which had to be "mistaken" as well, even though all were made in response to an official inquiry ordered by a Magistrate Judge of this Court.  (Doc. 862.)  It also offered no explanation for the other misleading statements and lack of diligence.

The matter came on for a hearing on August 20, 2018.  The Government made clear at the hearing that it would not conduct the searches necessary to ensure compliance with its discovery obligations unless ordered to do so by the Court.   The Court subsequently issued a sealed order requiring the Government to search for discoverable information in certain specific locations and produce to the defense any discoverable materials by September 24, 2018.  That date was later extended to November 1, 2018 upon stipulation of the parties.  On October 31, 2018 the Government disclosed another 79 pages of documents to the defense, some of which are highly redacted or are duplicates of information already disclosed.  There are no DEA-12 forms among them (documenting monetary expenditures).  Nor are there Standard Forms 1164 or 1165 (documenting expenditures on wiretaps and other SIU activities), DEA Annual Self-Inspections

42

Reports, or Significant Activity Reports.  These are all items specified by the affidavit of a defense expert previously filed herein, which should exist in the DEA system.  A renewed motion for those materials is being filed contemporaneously herewith.  However, given the deadlines now pending in this matter, the Defense is filing this motion at this time, and requesting leave to supplement if required by further disclosure from the Government.  It is also requested that, if the Government does not disclose these items, all of which are within its exclusive control, this Court should accept that the defense has tendered sufficient proof of the extensive monetary ties between the U.S. Government and Mexico's SIUs, to go forward in this matter.

II.   REASONS FOR DISMISSAL

    A.   The Torture and Abuse, Both Physical and Psychological, Inflicted on Mr. Paredes-Machado and His Wife by Mexican Authorities Acting On behalf of the United States Government Are Shocking to the Conscience, and Violated the Due Process Clause of the United States Constitution.

        1.   Mr. Paredes-Machado and his wife were subjected to torture.

This Court should dismiss the Indictment in this case on the grounds of outrageous government conduct, which violated the Due Process Clause of the Fifth Amendment.  The beating and water-boarding of Mr. Paredes-Machado, in combination with the threats against his wife to which he was subjected, constitute

43

torture for the purposes of this matter.  Similarly, the beating and other physical

and psychological mistreatment of Mr. Paredes-Machado's wife Rosa Icela also

constituted torture.

Torture is defined in the United States Code of Federal Regulations for the

Implementation of the Convention Against Torture as:

> [A]ny act by which severe pain or suffering, whether physical or
> mental, is intentionally inflicted on a person for such purposes as
> obtaining from him or her or a third person information or a
> confession, punishing him or her for an act he or she or a third person
> has committed or is suspected of having committed, or intimidating or
> coercing him or her or a third person, or for any reason based on
> discrimination of any kind, when such pain or suffering is inflicted by
> or at the instigation of or with the consent or acquiescence of a public
> official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1).  It cannot be denied that the acts of punching Mr.

Paredes-Machado, throwing him to the floor, and fastening him to a gurney, all

while hooded, and then expelling the air from his lungs and forcing water into his

facial openings repeatedly, constituted the intentional infliction of severe pain or

suffering, both physical and mental for the purpose of obtaining information and a

confession.  The threats to his wife added to his mental suffering.  These acts were

inflicted either by public officials or by other persons acting in an official

capacity.  In short, this was torture.

This treatment was so nightmarish that Mr. Paredes-Machado struggled

against his handcuffs to the point that they cut into his wrists so badly that he was

unable to use his right hand for several weeks, and his left wrist still bears scars to this day, more than seven years later.  Even with details like this, however, Mr. Paredes-Machado's cold affidavit cannot paint for this Court a full picture of the horror of this process; suffice it to say that it was so horrendous that it broke his will to resist after only a short time.

The severity of water-boarding, or the "water-torture" as it used to be called, is well documented by Judge Evan Wallach of the United States Court of Appeals for the Federal Circuit, formerly Judge of the United States Court of International Trade, who is one of the nation's foremost experts on war crimes and the law of war.  He has described the process of water-boarding extensively in his essay in the Columbia Journal of Transnational Law.  See e.g. Hon. Evan Wallach, Drop by Drop: Forgetting the History of Water Torture in U.S. Courts 45 Colum. J. Transnat'l L. 468 (2007).  He recounts the horrific effects of waterboarding, and the convictions for war crimes of Japanese soldiers who employed it in World War II.  The water flows into the victim's sinuses, which causes severe physical suffering in the form of reflexive choking, gagging, and the feeling of suffocation. (Id. at 474-75, 488.)[31]  The process prevents the victim from drawing breath, and

---

[31]  See also Evan Wallach, Waterboarding Used to Be a Crime washingtonpost.com Sunday, November 4, 2007, http://www.washingtonpost.com/wp-dyn/content/article/2007/11/02/AR2007110201170_2.html

causes panic, and terror of imminent death.  Many victims of waterboarding suffer prolonged mental harm for years and even decades afterward.  (Id. at 474-75.)  See also Open Letter to Attorney General Alberto Gonzales, Human Rights Watch, 5 April 2006 available at https://www.hrw.org/news/2006/04/05/open-letter-attorney-general-alberto-gonzales.

In the instant case, Mr. Paredes-Machado was not just waterboarded, in the generic sense of having water poured over his face.  In addition, while the water was being poured an interrogator jammed his knee into Mr. Paredes-Machado's stomach causing him to expel the air from his lungs, and then to involuntarily inhale water, swallow water, choke and feel the terrifying sensation of drowning. Moreover, Mr. Paredes-Machado suffered the psychological torture of being told that his wife was undergoing the same treatment at that same time, and that it would not stop until he submitted to the will of his inquisitors.  In other words, his resistence was responsible for her torture.  This threat was backed up by the fact that Rosa Icela was with Mr. Paredes-Machado when they were both captured, so he knew that his captors had her in their possession.  He knew they could make good on their threat, and he had little doubt they would do so.  This placed tremendous psychological stress on him, and in the end was a strong factor in breaking his resistence.

Likewise, the beating and psychological abuse of Mr. Paredes-Machado's

wife Rosa Icela also constituted torture.  At the beginning she was threatened with false prosecution, insinuations against her children were made, she was menaced with rape, and ultimately her hair was violently pulled and she was slapped hard.

These acts certainly constituted the intentional infliction of severe pain and suffering, both physical and mental, for the express purpose of obtaining information and a confession, and these acts were inflicted upon both Mr. Paredes-Machado and his wife Rosa Icela by public officials or other persons acting in an official capacity.  They are, therefore, "torture," as defined by law.

2.    <u>The Torture of Mr. Paredes-Machado and His Wife Is
Attributable to the United States Government Because the U.S.
Government Knew this Would Happen, and Because the Abuse
Was Inflicted by Officers of a Special Investigative Unit That
Is Essentially a Subsidiary of the U.S. Government.</u>

In order for a Court to grant dismissal in the context of a foreign arrest the proponent must demonstrate that "representatives of the United States participated or acquiesced in the alleged misconduct of the [foreign] officials," or that the arresting officers of the foreign country "were acting as agents of the United States in arresting or mistreating [the defendant] or that United States representatives were aware of such misconduct." <u>United States v. Lira</u>, 515 F.2d 68, 70-71 (2d Cir. 1975); <u>United States v. Pelaez</u>, 930 F.2d 520, 525-26 (6th Cir. 1991) (dismissal of indictment inapplicable where defendant has not alleged involvement

47

by U.S. officials, or alleged torture, brutality or physical force).

        a.    <u>The arrest was orchestrated by and for the U.S.
Government</u>.

The United States government was intricately involved in these arrests all
through the process, both before, during and after the torture.  We know that the
arrests of Mr. Paredes-Machado and his wife were purely the product of charges
pending in the United States *ab initio*.  There have been no charges lodged against
Mr. Paredes-Machado in Mexico, so the Mexican authorities were not operating
on their own behalf when arresting or interrogating these folks.  In addition, the
arresting agents told Mr. Paredes-Machado from the start that they were arresting
him on an extradition warrant from the United States.  They never mentioned any
Mexican charges.  Thus, the entire underlying authority for the arrest and
subsequent torture stemmed solely from U.S. charges.

Moreover, the Mexican authorities kept the U.S. Embassy closely informed
of what was being done on this arrest from the very first moments.  When Mr.
Paredes-Machado tried to get his captors to let him go they told him they could not
do so because the American Embassy had already been notified of their detention.
Thus, it is clear that whoever arrested Mr. Paredes-Machado and his wife felt the
need to report events quickly to the authorities at the United States Embassy, and
that those U.S. authorities had a controlling voice in what was done with the

prisoners.

        b.     <u>The U.S. Government was well aware that the Mexican authorities often subject captured persons to torture</u>.

      Whether or not the United States authorities explicitly asked for this torture to be inflicted, the simple fact is that they knew, or should have known, that the Mexican authorities would torture these people to gain confessions.  It is common knowledge that Mexican authorities routinely commit torture, especially after arresting drug suspects.  The fact that this is, and long has been, a widespread practice is apparent from the case law.  <u>See</u> <u>e.g.</u> <u>In re Weir</u>, 495 F.2d 879, 880 (9th Cir. 1974) (Defendant captured by Mexican officials in Mexico was threatened and tortured until he confessed); <u>United States v. Fernandez-Caro</u>, 677 F. Supp. 893, 894 (S.D. Tex. 1987) (to obtain confession Mexican Federal Judicial Police threatened to kill defendant, beat him about the face and body, poured water through his nostrils while he was stripped, bound and gagged, and applied electrical shocks to his wet body); <u>United States v. Patterson</u>, 812 F.2d 1188, 1189 (9th Cir. 1987) (defendant arrested in Tijuana taken to Federal Police Station and hit on back, sides, stomach, face, and testicles until he confessed); <u>Erickson v. United States</u>, 976 F.2d 1299, 1300 (9th Cir. 1992) (informant working for DEA arrested by Mexican authorities and tortured in jail.), <u>aff'd</u>, 269 F. App'x 451 (5th Cir. 2008); <u>Cornejo-Barreto v. Seifert</u>, 218 F.3d 1004, 1008 (9th Cir. 2000),

<u>overruled on other grounds</u> by <u>Trinidad y Garcia v. Thomas</u>, 683 F.3d 952 (9th

Cir. 2012) (Defendant introduced evidence that when arrested by State Judicial

Police in Tijuana in that he had chile shoved up his nostrils, and was subjected to

other torture).

      The torture of drug suspects after arrest by Mexican authorities is so well

known that it is referred to by short-hand in Mexican folk songs, such as the 1999

song "<u>Las Parcelas De Mendoza</u>" made popular by Sergio Vega.  The song tells of

a man who buys remote parcels of land on which, unbeknownst to him, marijuana

is growing.  Unfortunately for him helicopters full of *Federales* soon appear, the

roads are closed, and soon the *Federales* apply water-boarding, electric shock, and

forcing chili powder up his nose with soda water:

| SPANISH | ENGLISH |
|---|---|
| Las Tortutas en el cuerpo | The Tortures in your body |
| nunca jamas se te olvidan | never ever you forget |
| <u>la tabla el agua</u> y la pila | <u>the water, the board</u> and the battery |
| son de las mas conocidas | are the best known |
| chile polvo y minerales | chili powder with mineral water |
| se me escapaba la vida. | My life was escaping from me. |

(Emphasis added)

      This is not, however, just a matter of popular knowledge.  The United States

Government itself has acknowledged, both before and after these arrests, the

widespread use of post-arrest torture by police authorities in Mexico.

See e.g  United States Department of State, Bureau of Democracy, Human Rights and Labor, Country Reports on Human Rights Practices for 2009, available at https://www.state.gov/j/drl/rls/hrrpt/2009/wha/136119.htm (Detailing allegations known to U.S. government of killings by Mexican government security forces, and an increase in complaints involving cruel or degrading treatment and torture in 2009 as compared to 2008, few of which resulted in punishment; See also United States Department of State, Bureau of Democracy, Human Rights and Labor, Country Reports on Human Rights Practices for 2014 at 4-5, available at https://www.state.gov/documents/organization/236914.pdf (Discussing the hundreds of complaints of torture received and the report of the United Nations Special Rapporteur for Torture, who observed that torture of detainees usually occurred within hours after arrest.

The 2014 Report of the United Nations Special Rapporteur on Torture referred to by the State Department is included with this Motion as Exhibit U .[32] See also United States Department of State, Bureau of Democracy, Human Rights and Labor, Country Reports on Human Rights Practices for 2014, at 5 (citing data regarding torture in the state of Nuevo Laredo that "proves the use of torture as a tool for investigating and obtaining confessions is a standard procedure for the

---

[32]  Juan E. Mendez, Report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, Addendum, Mission to Mexico, (29 December 2014), attached as Exhibit U to this motion.

state's security forces.")

Notice of widespread torture by Mexican authorities is not new.  For

example, in1998 the Inter-American Commission on Human Rights of the

Organization of American States issued its Report on the Situation of Human

Rights in Mexico.[33]  Chapter IV of that Report (submitted as Exhibit V to this

Motion) covers the Right to Humane treatment.  The Commission noted that it had

received numerous complaints about incidents of torture in Mexico. According to

information received by the IACHR, most cases of torture and of cruel, inhuman

and degrading treatment occur in the context of the criminal justice system, mainly

during the early stages of the investigation of criminal offenses. The agents who

are usually guilty of committing acts of torture are members of the Federal and

state judicial police, the Office of the Public Prosecutor or the Armed Forces.

They gave as a representative example this incident that occurred in the

Federal District in 1996 in which a woman and her boyfriend were stopped, taken

out of their vehicle, and brought to the police station. She was interrogated about

where certain "merchandise" was stored.  At some point a bottle of water was

poured into her nose, and she felt she was drowning because they covered her

mouth and forced the water down.  She fell on her side and remained in that

position as they interrogated her. She was struck repeatedly.  A plastic bag was

---

[33]  Available at http://www.cidh.org/countryrep/Mexico98en/table-of-contents.htm

placed over her head causing her to faint. When she regained consciousness they continued asphyxiating her with the plastic bag, and escalated to applying electric shocks to her head and threatening to rape her.  They told her that they had her mother there and she was in bad shape from the beatings she had received, and that one of her children had to be taken to the hospital because of an injury to his testicles. She was later burned on her hands with a lit cigarette.  (Exhibit V).

The practice of post-arrest torture in Mexico remains ongoing and notorious to this day.  In November 2016, U.S. News and World Report published an article regarding torture in Mexico.[34]  The article discusses the fact that thousands of complaints of torture by security forces have been made over the past decade, few of which led to punishment.

In April of 2016 Mexico's defense secretary, Gen. Salvador Cienfuegos Zepeda addressed soldiers in a televised video decrying torture by the police and armed forces.[35]  In that case a young woman arrested on drug charges had a rifle

---

[34]  See Christopher Sherman and E. Eduardo Castillo, Torture Haunts Mexico Despite Laws Meant to Eliminate it, U.S. News and World Report Nov. 17, 2016, available at http://www.usnews.com/news/world/articles/2016-11-17/torture-haunts-mexico-despite-laws-meant-to-eliminate-it.  A copy of the article is attached hereto as Exhibit W.

[35]  Christopher Sherman, Defense Secretary Offers Apologies for Torture Video, the Associated Press, Houston Chronicle, April 16, 2016.  A copy of the article is submitted herewith as Exhibit X, and is available at https://www.houstonchronicle.com/news/nation-world/world/article/Mexico-s-defense-secretary-apologizes-for-torture-7253257.php.

muzzle pressed to her head and was suffocated with a plastic bag. José Miguel Vivanco, America's director at Human Rights Watch is quoted as saying that "unfortunately they only give these apologies when they have no choice, when there is no alternative because the images are irrefutably captured in the video." The article goes on to note that in February Mexico's Navy announced that it was investigating several Marines for allegedly torturing and sexually abusing six female suspects in the state of Veracruz in 2012. In October of 2015 it was announced that the United Nations committee against torture found Mexican soldiers had tortured four men with beatings, asphyxiation, and electric shocks in Baja California in 2009.

Likewise, the use of post-arrest torture has been well documented by the human-rights organization Amnesty International. In its 2014 report, Out of Control: torture and other ill-treatment in Mexico,[36] the organization found evidence of widespread use of torture by Mexican authorities. Its summary of findings states as follows:

- The widespread use of torture continues to be tolerated by authorities, despite Mexico's relatively strong legislation to prevent and punish torture and other ill-treatment.

- The large-scale deployment of the army and navy marines in recent years to combat organized crime has been a key factor in

---

[36] Available at https://amnesty.dk/media/1216/embargoed_out_of_control_torture_in_mexico.pdf. A copy is submitted herewith as Exhibit Y.

the increased use of torture.

- Reports of torture and other ill-treatment increased as violence spiraled in Mexico after 2006, as a result of the government's "war on drugs".  Even if recent reports of a decline by the CNDH are correct, torture and ill- treatment remains widespread – 600 per cent higher in 2013 compared to 2003.

- The justice system is unable or unwilling to prevent torture; key anti-torture safeguards area rarely upheld.

- Arbitrary detentions and the fabrication of evidence are often closely connected to the use of torture and other ill-treatment.

- A number of different torture techniques are reported consistently from different parts of the country. These include the use of near-asphyxiation, beatings, sexual violence, death threats and electric shocks.

- Torture is often used to obtain "confessions" and testimonies which serve as evidence to prosecute people who may or may not have been involved in a crime. This results in unfair trials and unsafe convictions, with many innocent people behind bars and criminals in the street. Society distrusts the justice system and the victims and their families' lives are destroyed.

- Mechanisms to hold those responsible to account are ineffective and fail to deter perpetrators or provide redress to victims.

- Well-founded complaints of torture are frequently dismissed or downgraded by prosecutors, official medical experts and human rights commissions.

- Medical examinations of suspects, including official procedures to investigate allegations of torture, often fall far short of international standards.

- The lack of independent, impartial and thorough investigations

> into allegations of torture place an impossible burden on
> victims to prove they were tortured.

Out of Control (Exhibit Y) at 6-7 (Footnote omitted).

The Out of Control Report goes on to discuss various torture methods used, which include wet cloths and waterboarding, as well as threats against the detainee's family.  (Id. at 10.)  Moreover, in 2016 Amnesty issued a Report entitled Surviving Death: Police and Military Torture of Women in Mexico,[37] demonstrating that Mexican police and armed forces routinely torture and mistreat women, and that sexual violence is routine during arrest and interrogation.

Amnesty found that the Mexican National Human Rights Commission (CNDH) had received thousands of reports of torture and other mistreatment between 2010 to 2013, with 2,021 reports received in 2011 alone.  Out of Control (Exhibit Y) at 11.  Moreover, the Mexican National Commission of Human Rights (Comisión Nacional de los Derechos Humanos, or "CNDH") maintains a publically-available website going back to 1990, which details hundreds of cases of abuse and torture of arrestees by Mexican state, federal and military authorities. See http://www.cndh.mx/Recomendaciones. These numbers, of course, grossly understate the actual number of tortures by Mexican Government authorities occur, because many people do not file complaints, and because the CNDH is

---

[37] Available at https://www.amnesty.org/en/documents/amr41/4237/2016/en/

56

primarily responsible for handling complaints against the federal agencies, but not

against state and municipal agents, which are handled by other agencies, if they

are ever investigated at all.  In short, torture by federal authorities such as those

who seized Mr. Paredes-Machado and his wife, is rampant and well-known, and is

inflicted by Mexican authorities with impunity.

>          c.     The SIU that arrested Mr. Paredes-Machado and his wife
>                 was essentially a subsidiary of the U.S. government.

In this case, it is clear that the Mexican police officers who arrested Mr.

Paredes-Machado and his wife were acting as agents of the United States in

arresting and mistreating them, and that United States representatives were aware

of such misconduct.  First, the arrests of Mr. Paredes-Machado and his wife were

the product of the so-called "intel T-III," which was run by and financed by the

United States Government.  Thus, the DEA knew the arrests were going to happen

before they did happen.  Moreover, the arrests were carried out by the SSP/SIU,

which as noted above, is essentially a subsidiary of the U.S. Government, trained

in Quantico Virginia, closely supervised by DEA agents, and funded in large part

by the United States Treasury.  The supervision of SIU officers by DEA agents

averages more than one agent to nine Mexican officers.  Although the Mexican

officers denied the torture during their depositions, it is patently obvious that those

denials are false.  The officers know that torture is technically illegal in Mexico,

so they denied any such torture, and the rules applied to the deposition shielded them from being exposed by effective cross examination.

Second, the nature of the questioning (asking about crimes now being prosecuted both here in Michigan and in New York) and creation of the video shows that the torture was conducted on behalf of the United States.  Mr. Paredes-Machado was arrested at the beheset of U.S. authorities for crimes to be prosecuted in the U.S., not in Mexico.  Thus, the questioning and creation of the video was obviously done for the U.S., and not for Mexico.  This conclusion is supported by the fact that the video was turned over to DEA Assistant Regional Director Mitchem by Commander Pequeno on January 24, 2011, within two weeks of the arrest.  And there is no question that the torture was conducted in order to obtain Mr. Paredes-Machado's cooperation in making the video.

Finally, the United States Government knows full well that Mexican law enforcement officials regularly extract confessions through torture within hours of arrest, but rarely face any negative consequence for it.  Nonetheless, there is nothing in the record to indicate that our Government did anything to stop it, even though Mr. Paredes-Machado and his wife were arrested exclusively for U.S. charges in this case.  It did not even ask.  Thus, it is clear that the torture was conducted on behalf of the United States.

3.   <u>This Court Has the Authority to Dismiss the Indictment.</u>

Federal courts have the authority to dismiss an indictment for "shockingly abusive" conduct by government agents under their supervisory powers.  That authority was first recognized by the United States Supreme Court in <u>Rochin v. California</u>, 342 U.S. 165 (1952).  In <u>Rochin</u>, sheriffs deputies who suspected the defendant of selling narcotics entered his home, forced open his bedroom door, and after unsuccessfully attempting to extract capsules from his mouth, took him to a hospital where a doctor pumped his stomach against his will, causing him to vomit, whereupon the deputies found two capsules containing morphine.  The Supreme Court stated:

> [T]he  Due Process Clause '***inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings (resulting in a conviction) in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples*** even toward those charged with the most heinous offenses.' These standards of justice are not authoritatively formulated anywhere as though they were specifics. Due process of law is a summarized constitutional guarantee of respect for those personal immunities which . . . are 'so rooted in the traditions and conscience of our people as to be ranked as fundamental', or are 'implicit in the concept of ordered liberty'.
>
> *   *   *   *   *
>
> Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are  ***methods too close to the rack and the screw to permit of constitutional differentiation***.

Rochin, 342 U.S. at 169-72 (emphasis added), citing Malinski v. New York, 324

U.S. 401, 416-17 (1945); Snyder v. Massachusetts, 291 U.S. 97, 105 (1934); Palko

v. Connecticut, 302 U.S. 319, 325 (1937).  The Court went on to hold that, to

sanction the deputy's actions, "would be to afford brutality the cloak of law," and

that the defendant's conviction therefore had to be dismissed as a matter of Due

Process.  Rochin, 342 U.S. 173-74.

> a.   Entrapment Cases must Be Distinguished from Those
>      Involving "Shockingly Abusive" Conduct.

In order to analyze Outrageous Government Conduct cases, it is logically

necessary to divide them into two categories: 1) "entrapment-based conduct,"

following United States v. Russell, 411 U.S. 423 (1973) and Hampton v. United

States, 425 U.S. 484, 488 (1976); and 2) "shockingly abusive" conduct, following

Rochin, supra  These two categories are analytically separate because entrapment

has its own set of rules and a remedy that is logically derived from the inherent

unfairness of the Government fabricating a crime that the person was not

previously inclined to commit.  Thus, the framework for analyzing entrapment

must necessarily account for the degree to which the defendant was already

inclined to violate the law, as opposed to being manipulated to do so by the

Government.  If the Government entraps a person who has no prior inclination to

commit a crime, then dismissal of that case, either by a jury or by the judge, makes

sense to counteract the fundamental unfairness of the Government creating the crime.  Otherwise, justice requires the case of a pre-disposed person to go forward.

That analytical framework, however, cannot be applied to "shockingly abusive" Government conduct in which a defendant is physically assaulted, as here.  In such cases the defendant's predisposition is irrelevant.  If predisposition were dispositive, then the Government's wrongdoing against the tortured person would have no real remedy, save for possibly a Bivens action against the individual abusers because torture after arrest is logically unrelated to the victim's predisposition.  And, as a practical matter, a Bivens action can never succeed where the abusers are members of a foreign police force, as is the case here, and not subject to United States civil jurisdiction.  Thus, the Government could simply sub-contract its torture to a foreign power with no consequence.

That outcome is precluded by Rochin.  Instead, shockingly abusive conduct must be analyzed separately under the Due Process Clause, which, as Rochin declared, inescapably imposes upon the courts an exercise of judgment upon the whole course of the proceedings in order to ascertain whether they offend those canons of decency and fairness rooted in the traditions and conscience of our society.

Accordingly, some of the Supreme Court cases that have discussed Rochin must be distinguished on the grounds that they are about entrapment, not

shockingly abusive conduct.  One such entrapment case was <u>Russell</u>, 411 U.S.

423.  In <u>Russell</u> police officers supplied the defendant, a methamphetamine

manufacturer, with a difficult-to-obtain ingredient.  He alleged entrapment.  In

holding that the entrapment defense is limited to situations in which the

Government's deception actually implants the criminal design in the mind of the

defendant, the Court stated it "may some day be presented with conduct by

government agents so outrageous that it should bar the government from

prosecuting at all."  However, the Court held that supplying a meth manufacturer

with a scarce ingredient simply did not rise to the level of violating that

"fundamental fairness, shocking to the universal sense of justice."  <u>Russell</u>, 411

U.S. at 431-32 <u>citing</u> <u>Kinsella v. United States ex rel. Singleton</u>, 361 U.S. 234, 246

(1960).

In another entrapment case, <u>Hampton</u>, 425 U.S. 484 a Government

informant supplied the defendant with heroin, which he then sold to police.  A

plurality of three justices held that an entrapment defense is not available in such a

case where the defendant was already predisposed to commit the crime.  <u>Id</u>. at

489-90.  A total of five justices, however, agreed in a concurrence and a dissent

that even where a defendant is predisposed to commit a crime, police misconduct

may still be outrageous enough to bar conviction under the Due Process principles

discussed in <u>Russell</u>.  <u>Id</u>. at 495-96, 499-500 ("the methods employed on behalf of

the Government to bring about conviction cannot be countenanced.") (Brennan, J.,

dissenting).

> b.    Cases about "Shockingly Abusive" Conduct Show That
>        Dismissal Is Required.

In County of Sacramento v. Lewis, 523 U.S. 833 (1998) the Supreme Court

noted that the acts in Rochin (illegally pumping the defendant's stomach and

finding pills) would today be analyzed under the Fourth Amendment, not the Due

Process Clause.  Lewis 523 U.S. at 849, n.9.  But Lewis was a case about a high

speed police chase resulting in death, and so suppression was inapplicable there,

just as it will probably not be applicable in the instant case because the

Government has now elected not to try to introduce at trial the post-torture video

of Mr. Paredes-Machado.[38]

In analyzing the facts presented in Lewis, the Court reviewed some 50 years

of jurisprudence beginning with Rochin and, in the end, it continued to adhere to

the proposition that substantive Due Process still limits what the Government may

do in its executive capacity, and that an abuse of power which shocks the

conscience is the benchmark for finding a Due Process violation.  Lewis, 523 U.S.

at 846-47.  The Lewis Court stated that when the Government restrains a person's

---

[38]   Should the Government attempt to introduce any other post-arrest
statement of Mr. Paredes-Machado, the defense reserves the right to challenge
such admission on involuntariness or other grounds.

liberty and, at the same time, fails to assume some responsibility for that person's safety and general well-being, it "transgresses the substantive limits on state action set by the Due Process clause." Id. at 85 citing DeShaney v. Winnebago County Dept. of Social Servs., 489 U.S. 189, 199-200 (1989).

That is exactly what happened here – the U.S. Government caused Mr. Paredes-Machado to be arrested, and then failed to make any attempt to provide for his safety from the Mexican Police, even though it knew they would probably torture him on behalf of the United States.  The Supreme Court has never overruled the above-cited cases.  They continue to be good law and binding authority.  See, e.g., Chavez v. Martinez, 538 U.S. 760, 787 (2003), Souter, J., delivering, in part, the opinion of the Court, citing Rochin for the proposition that the Due Process Clause of the Fourteenth Amendment protects individuals against state action that "shocks the conscience"); United States v. Booker, 728 F.3d 535, 545 (6th Cir. 2013) (also citing Rochin).

c.   The Ker-Frisbie Doctrine is Inapplicable here.

This conclusion does not contradict the so-called Ker-Frisbee doctrine. This doctrine is derived from the cases of  Ker v. People of State of Illinois, 119 U.S. 436 (1886) and Frisbie v. Collins, 342 U.S. 519 (1952).   In Ker a messenger forcibly kidnapped the defendant from Peru and brought him back to the United

States, even though he had been sent to Peru with a valid warrant and instructions to obtain the defendant with the cooperation of the local authorities. The Supreme Court rejected Ker's Due Process challenge, holding that "such forcible abduction is no sufficient reason why the party should not answer when brought within the jurisdiction of the court which has the right to try him for such an offence, and presents no valid objection to his trial in such court". Ker, 119 U.S. at 444. Although the arrest in Ker was said to be "forcible" and "with violence," id. at 438, it is unlike the present case because there was never any allegation in Ker that the defendant was tortured, or subjected to force that "shocked the conscience."

Similarly, in Frisbie v. Collins, 342 U.S. 519 (1952), the defendant was abducted by Michigan authorities in Chicago and brought to Michigan for trial.  It was alleged that he was "forcibly seized, handcuffed, blackjacked" by the Michigan officers. Frisbie 342 U.S. at 520.  Again, however, there was no allegation that the defendant was tortured, or subjected to actions that "shocked the conscience."  Applying its decision in Ker, the Supreme Court upheld the conviction over challenges based on due process and federal kidnapping laws.

The Supreme Court reaffirmed the doctrine yet again in Alvarez–Machain, 504 U.S. 655 (1992).  In that case DEA agents forcibly kidnapped the defendant in Mexico and brought him to the United States to stand trial for crimes in connection with the kidnapping, torture and murder of a DEA special agent and

his pilot.  Mexico entered a protest.  The defense moved to dismiss the indictment, arguing that the defendant's abduction constituted outrageous governmental conduct, violating the extradition treaty between the United States and Mexico. Although the Court described the abduction as "forcible" there was again no allegation of torture, or conduct so outrageous as to shock the conscience.  The Supreme Court examined the content of the treaty, determined that the United States and Mexico had made no agreement "to refrain from forcible abductions," and upheld the abduction/extradition citing Ker and Frisbie for the proposition that "the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.'" Id. 504 U.S. at 661-62.

Together, these cases demonstrate that the Ker-Frisbie doctrine is simply not applicable in the case at bar.  That doctrine holds that an "illegal arrest or detention does not void a subsequent conviction." Gerstein v. Pugh, 420 U.S. 103, 119(1975).  But is does not apply in the case of torture or physical violence against a person already arrested, that is so outrageous as to shock the conscience. That is the issue in this case.  Indeed the arrest here involved no violence at all.  It was the torture afterward, while these people were in the clutches of the Mexican Police, which shocks the conscience.

66

d.   The _Toscanino_ Line of Cases Applies here

The applicable authority governing torture in a foreign-arrest situation (as is the arrest in the present case) is best exemplified in the cases that stem from Rochin, such as United States v. Toscanino, 500 F.2d 267 (2d Cir. 1974).  In Toscanino, the defendant alleged that U.S. States agents abducted him from Uruguay, tortured and interrogated him, and ultimately drugged and brought him to the United States.  Id. at 269.  The Second Circuit Court of Appeals held that if Toscanino's allegations were true, his indictment was subject to dismissal based on the federal court's supervisory powers over the administration of criminal justice first outlined by the Supreme Court in McNabb v. United States, 318 U.S. 332, 340-41 (1943).  In holding that the supervisory powers of the court could require dismissal, Toscanino relied in part on Supreme Court decisions addressing other types of outrageous governmental conduct, including Rochin and Russell. Toscanino, 500 F.2d at 274-76.

The Toscanino Court stated, "we view due process as now requiring a court to divest itself of jurisdiction over the person of a defendant where it has been acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights."  Id., 500 F.2d at 275. In concurrence, Judge Anderson went on to state that the principle issue, as he saw it, was the "highly irregular activities of the Federal agents," and he stated that

"this court is not going to sanction or validate them by affirming the conviction of the defendant." Toscanino, 500 F.2d at 281 (Anderson, J. concurring)   The Second Circuit remanded the case to the district court for an evidentiary hearing to determine whether the defense could present some credible supporting evidence, including specifically evidence that the actions were taken by or at the direction of United States officials. Toscanino, 500 F.2d at 281.

The Second Circuit reexamined the issue of unlawful activities by foreign officials in Ex rel. Lujan v. Gengler, 510 F.2d 62 (2d Cir. 1975). Although Mr. Lujan claimed the government had forcibly removed him from a foreign country without going through formal extradition procedures, he did not claim that he had been subjected to any physical torture like that alleged in the Toscanino case. Judge Anderson, who had based his concurrence in Toscanino on the due process standard of Rochin, concurred again in Lujan, explaining that Toscanino "rest[ed] solely and exclusively upon the use of torture and other cruel and inhuman treatment." Thus, it was the torture, not the abduction, that put dismissal at issue.

The Second Circuit further refined the Toscanino doctrine in United States v. Lira, 515 F.2d 68 (2d Cir. 1975). In Lira the Chilean Police, at the request of the DEA, arrested Rafael Lira, a Chilean citizen. The Chilean authorities questioned Lira regarding the whereabouts of a co-conspirator, and brutally tortured him over a period of several weeks. The captors photographed Lira and

told him that "some Americans were waiting for his photograph." Lira allegedly saw two United States DEA agents in the hallway of the Chilean prosecutor's office, who were identified to him as agents Cecil and Frangulis. The Chileans eventually placed him on a plane to New York, accompanied by eight Chilean Police officers and DEA Agent Cecil.

In holding that the district court could properly retain jurisdiction over Mr. Lira despite the torture in that case, the Second Circuit noted that "[T]he record fails to reveal any substantial evidence that Chilean police were acting as agents of the United States in arresting or mistreating [Lira] or that United States representatives were aware of such misconduct." Lira, 515 F.2d at 70-71. The Court reasoned:

> Unlike Toscanino, where the defendant was kidnapped from Uruguay in defiance of the laws of the country, here the Government merely asked the Chilean Government to arrest and expel [Lira] in accord with its own procedures.... The DEA can hardly be expected to monitor the conduct of representatives of each foreign government to assure that a request for extradition or expulsion is carried out in accordance with American constitutional standards.... Since our Government has no control over the foreign police, extension of Toscanino to the present case would serve no purpose.

Id.

The difference between Lira and the present case is clear. In Lira, there was no showing that the United States had any control over the foreign police officers. In the present case, the officers were employed by a Sensitive Investigative Unit

that was vetted by, trained by, equipped by, funded by, supplied with intelligence by, and closely supervised by U.S. government personnel.  The relationship between the SIU and the DEA was like that between a glove, and the hand inside it.

The Ninth Circuit has adopted the <u>Toscanino</u> exception in principle.  <u>See</u> <u>United States v. Struckman</u>, 611 F.3d 560, 571 (9th Cir. 2010) (The Ker/Frisbie doctrine does not apply, and a court is deprived of jurisdiction over an extradited defendant, if . . . the United States government engaged in "misconduct 'of the most shocking and outrageous kind' to obtain his presence.") <u>citing</u> <u>United States v. Anderson</u>, 472 F.3d 662, 666 (9th Cir. 2006); <u>United States v. Matta–Ballesteros</u>, 71 F.3d 754, 762–64 (9th Cir. 1995).  <u>See</u> <u>also</u> <u>United States v. Valot</u>, 625 F.2d 308, 310 (9th Cir.1980).

Examination of other cases that have arisen after <u>Toscanino</u> shows that courts which have not granted dismissal have generally followed three paths when cases of this sort are presented.  One path, taken by the Seventh Circuit, has been to decline to adopt <u>Toscanino</u>, and deny relief to the defendant.  <u>Matta-Ballesteros v. Henman</u>, 896 F.2d 255, 263 (7th Cir. 1990).

A second path is followed in cases where torture or physical abuse occurred on foreign soil but, as in <u>Lira</u>, it was inflicted by persons other than United States officials, and the defense did not show that those persons were acting as agents of

the United States authorities when they were inflicting the abuse.  See e.g. United States v. Lopez, 542 F.2d 283, 284 (5th Cir. 1976); United States v. Lara, 539 F.2d 495, 495 (5th Cir. 1976); United States v. Marzano, 537 F.2d 257, 272 (7th Cir. 1976) abrogated on other grounds Carter v. United States, 530 U.S. 255 (2000); Matta-Ballesteros, 71 F.3d at 764 (9th Cir. 1995); United States v. Degollado, 696 F. Supp. 1136, 1139-40 (S.D. Tex. 1988).

A third group of courts have denied dismissal on the grounds that there was either insufficient proof of torture having been inflicted, or the abuse suffered was not sufficiently outrageous to warrant divestiture of jurisdiction. See United States v. Cordero, 668 F.2d 32, 37 (1st Cir. 1981); United States v. Reed, 639 F.2d 896, 901-02 (2d Cir. 1981); United States v. Romano, 706 F.2d 370, 372-73 (2d Cir. 1983); Lujan, 510 F.2d at 66 (1975); United States v. Postal, 589 F.2d 862, 874 n.17 (5th Cir. 1979); Struckman, 611 F.3d at 573–74 (9th Cir. 2010); Valot, 625 F.2d at 310 (9th Cir. 1980); United States v. Darby, 744 F.2d 1508, 1531 (11th Cir. 1984); United States v. Rosenthal, 793 F.2d 1214, 1232 (11th Cir. 1986).

Another good example of facts not rising to the level of outrageous conduct is seen in this Court's decision in United States v. Virbickas, 2013 WL 5246136 (E.D. Mich. Sept. 18, 2013).   In that case there were only two government actions alleged to have been "outrageous."  One was that the U.S. Government had supposedly violated the extradition treaty (a fact this Court determined not to have

been true) and second was that the defendant was allegedly tricked by an employer "influenced by the U.S. Government" into traveling from Lithuania to Poland, where he was arrested.  <u>Virbickas</u>, at 4.  The defendant failed to allege, however, much less demonstrate, that his extradition was accomplished through torture, brutality or physical force.  For that reason this Court found no Due Process violation.  Obviously <u>Virbickas</u>, is the polar opposite of the present case, in which the defendant was subjected to truly outrageous conduct that shocks the conscience, including being waterborded, beaten, and threatened with the torture of his wife.

The Sixth Circuit has directly addressed <u>Toscanino</u> only once, which was in <u>United States v. Pelaez</u>, 930 F.2d 520 (6th Cir. 1991)  In that case the Court of Appeals did not decide whether to adopt <u>Toscanino</u> or not.  Instead, it simply noted that <u>Toscanino</u> did not apply therein because the defense had not argued that United States officials had any involvement with the extradition of Mr. Pelaez from Colombia or that any degree of physical force or brutality was involved in his arrest.  <u>Pelaez</u>, 930 F.2d at 525.  Thus, at this time the Sixth Circuit case law fits with the second and third groups, having denied <u>Toscanino</u> relief on the grounds that there was no brutality and U.S. officials were not involved.


        B.    <u>The Facts of the Present Case Require Dismissal of This Indictment</u>.

Dismissal of the Indictment is required in this case because the torture and abuse inflicted on Mr. Paredes-Machado and his wife were shocking to the conscience, and they were inflicted by persons who were acting on behalf of the United States Government, and the United States Government knew or should have known this torture would occur.

1.    The Torture and Coercion of Mr. Paredes-Machado and His Wife Are Shocking to the Conscience

Seen in their totality, the abuse inflicted on Mr. Paredes-Machado and his wife are shocking to the conscience.  This man was then subjected to both physical and psychological torture and degradation.  At first he was treated harshly, but within normal behavior.  That harsh treatment escalated, however, when he refused to give the information the interrogators wanted.  Interrogation escalated to threats accompanied by low-level physical abuse in the form of slapping.  When this did not produce the desired cooperation, he was threatened that his wife would be tortured.  Threatening to torture a person's wife, whom that person knows to be vulnerable to the threat being carried out, is certainly far outside the bounds of civilized interrogation methods.

When these methods did not work, Mr. Paredes-Machado was then taken to a second room where the true nightmare began.  It started with him being punched repeatedly in the abdomen, and then thrown to the floor.  He was then stripped of

73

his clothing and strapped to a gurney, and held in place.  A hood was placed over his head and someone whom he could not see jammed a knee into his stomach so that all of the air was expelled from his lungs.  Water was then poured over his face and into his mouth so that he began to choke and felt the sensation that he was drowning.  He may have been drugged.  As this was done his cooperation was demanded, and he was told his wife was suffering the same treatment.

Meanwhile, she herself was undergoing physical and psychological abuse. These included slapping, violent hair pulling and threats of rape and framed-up prosecution. This prolonged torture of both husband and wife makes the mere stomach pumping of <u>Rochin</u> seem like a walk in the park.  The conduct in <u>Rochin</u> required dismissal; *a fortiori*, this case requires it even more so.  There can be no question that the actions herein are abhorrent, and shock the conscience.

2.  <u>The U.S. Government Cannot Be Permitted to Benefit In Our Courts of Law From Turning a Blind Eye to the Practices it Knows to Exist</u>.

It is obvious that in the case of Mr. Paredes-Machado, it was the government of the United States that stood to benefit from the "confessions" that are the product of this torture.  The Government cannot be permitted to simply stand idly by while its Mexican partners savagely torture the prisoners that they have captured solely on the basis of a U.S. arrest warrant, and then indignantly

proclaim that the United States Government is shocked - *shocked!* - that torture

has occurred.  The American authorities are not school children.  They know, or at

least should know, what the Mexican police will do to these people when they

arrest them.  At the very least the U.S. authorities should have demanded that the

Mexican authorities refrain from the use of torture or coercion on the arrested

persons.  In addition, it should have requested to have U.S. agents accompany the

Mexican authorities making the arrest to prevent the application of torture that it

knows full well to be so widespread.  If that request was denied, or was somehow

impractical, then it should have demanded to be allowed to have U.S. agents

admitted to the facility where Mr. Paredes and his wife were being held within a

short time of their arrival, to prevent the torture and abuse that it knew would

happen.  After all, American authorities knew of the facts underlying the arrest

(i.e. where and when Mr. Paredes-Machado would be located) and then were

informed of the arrest immediately, so there was plenty of time for them to have

intervened, or at least tried to before the arrestees reached the PFP building an

hour later.

It did none of these things.  Instead, our Government left the Mexican

authorities alone with their victims to terrorize and torment them for as long as

they pleased, until the Mexican authorities had gotten all that they could.  All in a

night's work for the modern-day Torquemadas of Mexico City; and all with

75

plausible deniability and the semblance of clean hands for their U.S. partners.

It is clear as well that this torture did take place. Otherwise, why would anyone have given the videotaped confession that Mr. Paredes-Machado gave? And how is it possible that the police officers who say they had custody of Mr. Paredes-Machado and his wife that whole time have no idea now how videotaped confessions by both were obtained during the time that they had sole custody of them? The truth is obvious: those officers either were the torturers, or they worked hand-in-glove with them.

It is true that the defense cannot prove that agents of the United States Government participated in this torture. That is hard to prove when the people being tortured are suddenly seized off the street, blindfolded, and spirited off to a police station by non-uniformed individuals who then put their head in a bag and subject them to a night of terror that they feared they would never survive. Needless to say, the torturers did not offer their business cards, or introduce themselves. Mr. Paredes-Machado and his wife obviously felt in no position to demand their credentials and have their handcuffs opened so that they could take notes. So no, we do not know if U.S. agents were physically among the torturers.

But it is clear that whoever did this, whether U.S. agents took part, or were merely present, or were not present at all, the authorities of the United States were responsible. They may have been there, but if not they either knew or should have

76

known that it would occur, and they could have at least taken steps to stop it.

County of Sacramento v. Lewis, supra (when Government restrains a person's liberty and, at the same time, fails to assume some responsibility for that person's safety and general well-being, it "transgresses the substantive limits on state action set by the Due Process clause.")

U.S. agents took no steps to protect Mr. Paredes-Machado and his wife from torture while they were in the hands of the SIU that we train, pay for, equip, assist and supervise. On that basis they are just as culpable for the torture as if they had done it themselves. Just as an employer is responsible for the actions of an employee under the doctrine of *respondeat superior*, or conspirators are responsible for the foreseeable actions of their co-conspirators, so the United States Government is responsible for the foreseeable acts of its Mexican partners here.

Thus, this Court should find that even if the abuse in this case was inflicted by persons other than United States officials, that those persons were effectively acting as agents of the United States authorities when they were inflicting the abuse, and that therefore that aspect of the test for dismissal of the indictment is met here. In short, the conduct itself is shocking to the conscience, and it is no less so just because it was committed by a party acting ostensibly on its own, but *sub silentio* on behalf of the United States Government.

3.    <u>Summary</u>

This Court should dismiss the Indictment in this case on the grounds that

Mr. Paredes-Machado and his wife were subjected to outrageous government

conduct that shocks the conscience.  The beating and water-boarding of Mr.

Paredes-Machado, the threats to him that his wife would be tortured, in

combination with the beating and other physical and psychological torture of his

wife Rosa Icela all constituted torture.  Although the defense has not yet been able

to prove that U.S. authorities participated in the torture, they are still responsible

for it because they knew or should have known that it would happen, they had the

ability to prevent it, and they failed to even try to do so.  Accordingly, dismissal is

warranted.


III.    <u>REQUEST FOR HEARING</u>

It is well established that defendants have a right to object to the use of the

confession, and to have a fair hearing on the issue that is uninfluenced by the truth

or falsity of the confession.  <u>Jackson v. Denno</u>, 378 U.S. 368, 376-77 (1964).  That

hearing must be held prior to the admission of a confession, with the trial judge

making an independent determination of the statement's voluntariness after an

adequate hearing on the issue.  <u>Summitt v. Bordenkircher</u>, 608 F.2d 247, 250 (6th

Cir. 1979).  This applies to the issue of dismissing the Indictment as well.  United

States v. Lambros, 65 F.3d 698, 701 (8th Cir.1995) (district court should make

specific factual finding under Toscanino with regard to the alleged United States

involvement in abduction of defendant by foreign officials); United States v.

Orsini, 402 F.Supp. 1218 (E.D.N.Y.1975) (hearing should be held under

Toscanino to consider defendant's sworn affidavit "setting forth ... allegations of

acts of torture, brutality, and inhumanity committed against him by or at the

direction of American Agents").  Accordingly, a hearing on this matter is

requested.


IV.    CONCLUSION

       For the reasons stated above, this Court should conduct an evidentiary

hearing in this matter, and after hearing the evidence should dismiss the

Indictment in this case.


DATED:  November 15, 2018        _____

                                        Stephen G. Ralls
                                        Attorney for Defendant
                                        314 S. Sixth Ave.
                                        Tucson, AZ 85701
                                        Office: (520) 884-1234
                                        Fax: (520) 884-9687
                                        Email: steve@rallslawoffice.com

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on November 15, 2018, I served a copy of the attached

motion and brief upon William Sauget, Assistant United States Attorney, by filing

same electronically.


s/ *Stephen Ralls*
Stephen Ralls

## INDEX TO EXHIBITS

Exhibit A =   Letter, Mr. Joseph E. Evans to Mr. Irving Barrios Mojica, dated December 7, 2010

Exhibit B =   Statement of Marco Antonio Paredes-Machado (in Spanish)

Exhibit C =   Statement of Marco Antonio Paredes-Machado (in English)  [Exh C to Initial Motion, doc. #782].

Exhibit D =  Statement of Rosa Icela Ponce-Valencia (in Spanish)

Exhibit E =  Statement of Rosa Icela Ponce-Valencia  (in English)

Exhibit F =   Affidavit of William Sauget in Support of Request for Extradition

Exhibit G =   Recommendation dated March 11, 2011 by Mexican Deputy Attorney General for International Affairs Jorge Alberto Lara Rivera to Judge Graciela Malja Aguirre of the Court of Criminal Matters for the Second Circuit in the Federal District of Mexico for the Extradition of Marco Paredes-Machado

Exhibit H =  Drug Enforcement Administration International Operations, Chapter 3 (2007), available at https://oig.justice.gov/reports/DEA/a0719/chapter3.htm.

Exhibit I =   DEA-6 report of Special Agt. Michael T. Garcia dated 1-21-11 [indicating that Mr. Paredes-Machado and his wife were in fact arrested by an SIU].  Filed as Defense Exhibit B  at June 19, 2017 hearing

Exhibit J =   DEA report of Special Agt. Christopher Thompson dated 1-19-2011. Filed as Defense Exhibit C at June 19, 2017 hearing.

Exhibit K =  DEA-6 report of  Special Agent  Christopher Thompson, dated 9-7-2010

Exhibit M =           Reporter's Transcript of Videotaped Deposition of Doctor Jose Antonio Viveros Orozco, Mexico City, Mexico, November 29,

2017.

Exhibit N =      Reporter's Transcript of Videotaped Deposition of Ofc. Diana Elizabeth Gonzalez Garcia, Mexico City, Mexico, November 29, 2017.

Exhibit O = Reporter's Transcript of Videotaped Deposition of Ofc. Jorge Adrian Hernandez Castro, Mexico City, Mexico, November 29, 2017.

Exhibit P =  English translation of Medical report of Dr. Jose Antonio Viveros Orozco dated January 12, 2011 at 2:20 a.m. at SEIDO.

Exhibit Q = Report by Dr. Mauro Cabrillo Castillo dated January 13, 2011.

Exhibit R =  Federal police Narcotics Division Official Letter Number PF/DA/CICTA/046/2011, Re: Localization and Presentation; Mexico City January 12, 2011.

Exhibit S = Evidence Sheets, listing arrival time of 2:00 a.m. January 12, 2011.

Exhibit T = Affidavit of computer forensic expert Brian Chase

Exhibit U =      Juan E. Mendez, Report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, Addendum, Mission to Mexico, (29 December 2014).

Exhibit V =  Report on the Situation of Human Rights in Mexico, Inter-American Commission on Human Rights of the Organization of American States (1998), - excerpt: Chapter IV, available at http://www.cidh.org/countryrep/Mexico98en/table-of-contents.htm.

Exhibit W =     Christopher Sherman and E. Eduardo Castillo, Torture Haunts Mexico Despite Laws Meant to Eliminate it, U.S. News and World Report Nov. 17, 2016, available at http://www.usnews.com/news/world/articles/2016-11-17/torture-haunts-mexico-despite-laws-meant-to-eliminate-it.

Exhibit X = Christopher Sherman, Defense Secretary Offers Apologies for Torture Video, the Associated Press, Houston Chronicle, April 16, 2016.

https://www.houstonchronicle.com/news/nation-world/world/article/
Mexico-s-defense-secretary-apologizes-for-torture-7253257.php

Exhibit Y =   Amnesty International, <u>Out of Control: torture and other ill-treatment
in Mexico</u> (2014) available at  https://amnesty.
dk/media/1216/embargoed_out_of_control_torture_in_mexico.pdf.