UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,             Case No. 03-cr-80244
                                          Honorable Victoria A. Roberts
    v.                                Magistrate Judge David R. Grand

MARCO ANTONIO PAREDES-MACHADO,

                    Defendant.

_____/

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO DISMISS INDICTMENT [885]**

## I.    REPORT

### A.    Introduction

On November 9, 2005, an Eastern District of Michigan grand jury returned a Sixth Superseding Indictment in which Defendant Marco Antonio Paredes-Machado ("Paredes-Machado") was charged with Conspiracy to Distribute and to Import More Than 1,000 Kilograms of Marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 846, 952, 960(a)(1), and 963. (Doc. #394). An arrest warrant and extradition request were issued for Paredes-Machado, who was believed to be living in Mexico. (Docs. #899 at 1; #885 at 10). It took almost a decade for Paredes-Machado to be arrested in Mexico and brought to the Eastern District of Michigan to face the charges; the docket shows no significant activity from November 2005 until Paredes-Machado's initial appearance on September 10, 2015, where he consented to pretrial detention. (Doc. #768).

After filing multiple discovery motions and engaging in limited discovery, on November 15, 2018, Paredes-Machado filed a motion to dismiss the indictment against him, arguing that dismissal is appropriate due to "outrageous government conduct" that took place after his arrest in

Mexico.  (Doc. #885).  More specifically, Paredes-Machado alleges that Mexican officers tortured him (and his wife) before turning him over to United States agents.  Further, Paredes-Machado asserts that the Mexican officers were "agents" of the United States, and that, at a minimum, when the United States asked Mexico to aid in his apprehension, it knew or should have known that the Mexican officers would torture him.  The motion was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B) (Doc. #893), and has been fully briefed (Docs. #899; #904; #908).  The Court held oral argument on February 4, 2019.

For the reasons stated below, while Paredes-Machado's allegations and evidence raise serious concerns about his treatment by the Mexican arresting officers, some of whom may have received training and funding from the United States government,[1] dismissal of the criminal charges against him is not an available remedy for any such abuse.  Accordingly, the Court should deny Paredes-Machado's motion.

### B.      Factual Background Related to Paredes-Machado's Arrest and Alleged Torture

Throughout 2010, the United States government was in communication with the Mexican authorities in connection with the warrant for Paredes-Machado's arrest and extradition to the United States.  (*See* Docs. #885 at 10; #885-1).  It is undisputed that Sensitive Investigative Units ("SIUs") were involved in the investigation.  (*See e.g.,* Docs. #847 at 6-7, n.6; #899 at 5-6; 909-1; #885 at 35).  According to Paredes-Machado, the Drug Enforcement Administration ("DEA") office in Hermosillo, Mexico "conducted a number of 'coordination meetings' between DEA agents and agents of the Mexican Secretaria de Seguridad Publica ("SSP"), a Mexican federal law

---

[1] The Court has written extensively about evidence Paredes-Machado proffered in support of his contention that Mexican officers waterboarded and tortured him and his wife, and that those officers worked in a unit that received training, funding, and at least some oversight by the United States.  (*See e.g.*, Docs. #803 at 6-10; #847 at 9-10, 13-19; #865 at 4-7).  The Court hereby incorporates by reference all of its prior rulings on these issues.  (Docs. #803; #847; #865).

enforcement agency." (Doc. #885 at 10). Paredes-Machado claims that the DEA and SSP then initiated an "intel T-III" wiretap (which the United States allegedly funded) on a phone suspected to be linked to Paredes-Machado's wife. (*Id.* at 12). Through the wiretap, authorities learned that Paredes-Machado had an upcoming medical appointment at a hospital in Mexico City. (*Id.*; Doc. #885-3; #909-1).

On January 11, 2011, as Paredes-Machado and his wife left the hospital, both were apprehended by the SSP. (*Id.*). Although Paredes-Machado believes he was arrested by Mexican federal agents, none showed identification, and all were dressed in civilian clothing. (Docs. #885-3 at 1; #885 at 17). Paredes-Machado also claims he was arrested solely under an extradition warrant issued out of the Eastern District of Michigan, and not in connection with any charges against him in Mexico, as he was not facing any in that country. (Docs. #885-3 at 1; #885 at 14). The DEA was informed of Paredes-Machado's arrest that same day. Paredes-Machado claims he offered to bribe his way out of the situation, but was told by the SSP agents that "it was too late because the American Embassy had already been notified of [his arrest]." (Doc. #885-3 at 1).

The time of Paredes-Machado's arrest on January 11, 2011 is disputed. Paredes-Machado claims he was arrested around 5:30 p.m., immediately after his doctor's appointment, but the arresting officers testified that the arrest occurred much later—at 8:45 p.m. (Docs. #909-2 at 4; #909-4 at 13-16; 909-5 at 10-12). As a result of this discrepancy, Paredes-Machado claims that more than three hours of custody is "conveniently erase[d]" from official documentation.[2] (Doc. #885 at 26). Nonetheless, it is undisputed that the arrest itself occurred "without incident." (Docs. #885 at 12; #909-1 at 3).

---

[2] Paredes-Machado has presented evidence which arguably supports his version of the timing. This includes testimony from one of the arresting officers that the relatively short trip from the hospital to the PFP office took at least three hours because, "It was approximately before midnight, [] there was a lot of traffic. It was rush hour." (Doc. #909-5 at 12; *see also* #909-4 at 13-16).

Paredes-Machado details a disturbing account of what happened next.  Paredes-Machado claims he and his wife were separated in different cars and transported "to a location that [he knew] as the offices of the PFP (Policia Federal Preventiva, or Federal Preventive Police)," a Mexican federal police force.  (Doc. #885-3 at 2).  Upon arriving at the PFP building, Paredes-Machado claims a black silk pillowcase was placed over his head, he was handcuffed, and authorities threatened to torture him and his wife if he did not answer their questions.  (*Id.*).  Paredes-Machado could not see the agents interrogating him because his eyes were covered, but he claims it sounded like two or three different persons.  After he was moved to a second room, he claims his shirt was removed, he was punched several times in the stomach, and then thrown on the floor.  (*Id.* at 2-3).

With his hands still handcuffed, according to Paredes-Machado, he was then placed on a gurney, his feet were restrained, and an interrogator sat on his legs.  He then "felt another interrogator jam his knee into my stomach causing me to expel all of the air out of my lungs. Simultaneously another interrogator poured water over the hood into my mouth causing me to involuntarily swallow water and choke and feel as though I was drowning."  (*Id.* at 3).  He was told this sequence would be repeated until he "gave the requested answers," and that his wife was undergoing the same treatment.  After seven or eight instances, Paredes-Machado claims he heard "the lead interrogator tell someone to bring the barrel of water," and thought that he would be put head first into the barrel.  When he "believed that [he] would be killed and that [his] wife would also suffer the same[,] [he] agreed to tell the interrogators what they wanted to hear."  (*Id.*).  At that point, he felt a sensation "like [] floating in the clouds," and suspected that the water poured into his mouth may have included drugs.  (*Id.* at 4).  He was then instructed how to cooperate, and rehearsed questions and answers for his videotaped statement.

Because he was struggling against the handcuffs, which dug into his skin, Paredes-Machado claims that a scar remains on his left wrist from the incident. (Doc. #885 at 22, 43). In support of this claim, Paredes-Machado relies on two seemingly contradictory pieces of evidence. Whereas the arresting officers testified that Paredes-Machado was not handcuffed when he was arrested or transported to the PFP, and that they did not observe any cuts on his wrists (Docs. #909-4 at 16, 37; 909-5 at 12, 25), the report of a medical examination conducted shortly after Paredes-Machado left the arresting officers' custody arguably suggests he suffered injuries consistent with one struggling while handcuffed:

> Two parallel and linear excoriations. The first one is five centimeters long and the second is three centimeters long. Both are located on the back of his right hand. Another linear excoriation, nine centimeters long, is on the back of his left hand. One six-centimeter linear excoriation is on the front side, distal third, of left forearm. One seven-centimeter linear excoriation is on the front side, distal third, of right forearm. Yellow ecchymosis (4 x 3 centimeters), located in the second intercostal space above the right mid-clavicular line.

(Doc. #885-10).

Paredes-Machado's wife recounts a similarly disturbing, although slightly different, narrative of the torture and threats she allegedly endured from authorities aiming to obtain her statement. (Doc. #885-5). Both Paredes-Machado and his wife eventually gave videotaped statements which were turned over to United States agents in Mexico. Paredes-Machado characterizes his statement as including a "confession." (Doc. #885 at *e.g.*, 51, 54, 81, 83).

The United States government essentially takes no position as to whether Paredes-Machado was actually tortured, but contends "there is no showing the DEA condoned or participated in the alleged mistreatment; nor is there any evidence suggesting DEA was present at Paredes-Machado's arrest." (Doc. #899 at 4). Moreover, the government denies that it knew or should have known that Mexican authorities assisting with Paredes-Machado's arrest would torture him.

Regardless, the government has recently advised Paredes-Machado that "it will not seek admission of [his] post-arrest statement."[3] (*See* Doc. #895-3).

### C.    Procedural Background

Paredes-Machado has filed several discovery motions in this case seeking information about the United States government's involvement, if any, in the events described above, and about the following related topics: relevant communication between the government and Mexican authorities; funding of Mexican authorities involved in his arrest; training materials and names of DEA agents supervising or training the Mexican authorities involved in his arrest and interrogation; and similar related evidence. (*See* Docs. #782; #834; #845; #854; #886).  Although the government has produced various documents sought by Paredes-Machado, its responses to his discovery motions and the Court's related orders have been troubling in certain respects, leading the Court to find that the government's contention that it "has viewed its discovery obligation as a continuing duty . . ." did not square with the evidence.  (Doc. #865 at 7; *see also* Docs. #847 at 13-18; #865 at 4-7).  In fact, still pending before the Court is Paredes-Machado's third motion for disclosure, filed November 15, 2018, in which he raises additional issues with the government's compliance with its discovery obligations and this Court's orders.  (Doc. #886).

Also on November 15, 2018, Paredes-Machado filed his instant motion to dismiss the indictment, in which he argues that the charges against him should be dismissed due to "outrageous government conduct."  (Doc. #885).  In light of that motion, the Court entered a stipulated order

---

[3] Relatedly, Paredes-Machado appears to believe the government will not seek to admit his wife's statements.  (*See* Doc. #904 at 3).  That is the Court's understanding, as well, as the government argues that its obligation to produce documents in response to Paredes-Machado's discovery requests (which relate to the torture allegedly suffered by both Paredes-Machado and his wife) is now moot in light of its agreement.  (Doc. #895 at 4).

in which the parties agreed to adjourn Paredes-Machado's third motion for disclosure until the Court resolves his motion to dismiss. (Doc. #907).

### D.     Standard of Review

Pursuant to Federal Rule of Criminal Procedure 12(b), "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Rule 12(b)(3)(A) further provides that a motion "alleging a defect in instituting the prosecution" must be raised by pretrial motion. The Supreme Court has held that "a defense may be properly raised pursuant to Rule 12 'if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense.'" *United States v. Ali*, 557 F.3d 715, 719 (6th Cir. 2009) (citing *United States v. Covington,* 395 U.S. 57, 60 (1969)). A motion under Rule 12 is appropriate for questions of law rather than fact. *Id.*

While the parties dispute the availability to Paredes-Machado of the "outrageous government conduct" defense, where it does apply, it is a question of law as to whether the challenged government conduct is sufficiently "outrageous" to warrant dismissal of the charges. *See United States v. Foster*, 835 F. Supp. 360, 364-65, n.7 (E.D. Mich. 1993) ("Outrageous government conduct is a purely legal defense, and it applies only if the government violated defendant's constitutional rights to such an extent that a court should not allow the government to prosecute him, regardless of his predisposition to commit a crime.") (internal citation omitted); *United States v. Tucker,* 28 F.3d 1420, 1421 n. 1 (6th Cir. 1994) ("This court reviews whether 'outrageous government conduct' is a valid basis for dismissing an indictment—a question of law—*de novo*."); *United States v. Miller*, 696 F. App'x 696, 699 (6th Cir. 2017). Moreover, the defendant bears the burden of proving outrageous government conduct by a preponderance of the

evidence.  *See United States v. Hammadi*, 737 F.3d 1043, 1048 (6th Cir. 2013) ("the defendant

bears the burden of proof as to his lack of predisposition and to the outrageousness of government

conduct…Hammadi has [] failed to prove by a preponderance of the evidence that the

government's conduct was so outrageous as to present a due-process concern.").

As discussed in detail below, the "outrageous government conduct" defense is unavailable

to Paredes-Machado because the government conduct in question is in no way intertwined with

the criminal activity for which he is charged, and the government has agreed not to use at trial any

evidence obtained as a result of the challenged conduct.  Accordingly, Paredes-Machado's motion

to dismiss the indictment fails as a matter of law and should be denied.

### E.    Analysis

Paredes-Machado argues that his indictment should be dismissed because he and his wife

were tortured after he was arrested in Mexico under an American warrant.  He argues that this

torture was committed by the Mexico City SSP/SIU, which he alleges "is essentially a subsidiary

of the U.S. Government [because] [t]he officers are trained in Quantico Virginia, they are

supervised by DEA agents, they are furnished by the U.S. Government with both equipment and

intelligence as to assets they can seize and what phone numbers to intercept, and they are directly

funded in large part by the United States Treasury, including payments to the highest ranking

members." (Doc. #885 at 38-39).  Paredes-Machado argues that his torture constitutes outrageous

government conduct that "shocks the conscience."  Accordingly, Paredes-Machado urges this

Court to dismiss the charges against him to prevent the United States from benefiting from his

prosecution after "simply stand[ing] idly by while its Mexican partners savagely torture the

prisoners that they have captured solely on the basis of a U.S. arrest warrant." (Doc. #855 at 81).

In support of his argument, Paredes-Machado submits a plethora of exhibits, including DEA

reports about the investigation and arrest, showing the involvement of SIU/SSP units, medical reports from doctors who examined Paredes-Machado for injuries shortly after his arrest, various reports examining the alleged frequent torture of arrestees at the hands of law enforcement in Mexico, and statements from both Paredes-Machado and his wife detailing allegations of torture against them.  (Docs. #885-1-18).

The government principally contests the legal basis of Paredes-Machado's motion, arguing, "[t]he so-called 'outrageous government conduct' defense is [] unavailable," as "[t]he Sixth Circuit has [] 'soundly rejected'" it.  (Doc. #899 at 7, 9).  The government also argues that under Fourth Amendment principles, the only appropriate legal remedy would be to suppress Paredes-Machado's videotaped statement, relief the government has already agreed to.  (*Id.* at 7). Finally, the government disputes that the U.S. can be implicated in Paredes-Machado's torture, because there is "no showing the DEA condoned or participated in the alleged mistreatment; nor is there any evidence suggesting [the] DEA was present at Paredes-Machado's arrest."  (*Id.* at 4).

Preliminarily, this Court is troubled by Paredes-Machado's allegations of torture at the hands of the Mexican officers who arrested him on a U.S.- issued warrant, which allegations mirror those in other similar recent cases.  For instance, in *United States v. Leon*, No. 09-CR-383-16, 2018 WL 4339374, at *3 (N.D. Ill. Sept. 11, 2018), the Honorable Rubén Castillo wrote that he had "carefully reviewed Defendant's voluminous submission," and, citing principally to a 2014 United Nations report and a 2014 report by Amnesty International, found that Leon "present[ed] a disturbing picture of law enforcement in Mexico" that includes the "generalized" use of torture in Mexico "as punishment and as a means of investigation."  (*Id.*) (citations omitted).  Given that Paredes-Machado is represented by the same counsel who represented Leon, it is not surprising

that Paredes-Machado painted a similarly alarming picture of the use of torture in Mexico by law enforcement officers.

Paredes-Machado argues it "is common knowledge that Mexican authorities routinely commit torture, especially after arresting drug suspects," and the "United States Government itself has acknowledged, both before and after these arrests, the widespread use of post-arrest torture by police authorities in Mexico," citing several news articles in support, including the same 2014 Amnesty Int'l Report that Chief Judge Castillo referenced in *Leon* which states that instances of torture and other ill-treatment in Mexico were 600 per cent higher in 2013 than in 2003, and that 64% of Mexicans fear suffering torture if taken into custody. (Docs. #885 at 57-63; #885-18 at 8, 12, 67). According to an Associated Press article presented by Paredes-Machado, from December 2006 through October 2014, Mexico's Attorney General's Office registered 4,055 complaints of torture. (Doc. #885-16 at 1). Pursuant to the "Report of the Special Rapporteur on torture and other cruel, inhuman, or degrading treatment or punishment," "[t]orture and ill-treatment in the moments following detention and before detainees are brought before a judge are generalized in Mexico and occur in a context of impunity, the aim usually being to inflict punishment or to extract confessions or information." (Doc. #884-14 at 18). And, as in *Leon*, Paredes-Machado asserts that the United States is fully aware of the likelihood that persons it requests Mexico to locate, arrest, and extradite, will be tortured during that process. (Doc. #885 at 64-65).

This Court also shares Chief Judge Castillo's great concern with "the accusation that American law enforcement agents may be condoning or turning a blind eye to [the use of torture

in Mexico] to bring defendants to trial in the United States,"[4] and would also find it abhorrent if the United States government had any level of complicity, directly or indirectly, in such torture.

It is undisputed that the U.S. was involved in the investigation leading up to Paredes-Machado's arrest, and the underlying arrest itself was pursuant to a U.S. warrant. However, even if the United States knew, generally, of accusations of wide-spread use of torture by Mexican authorities, and even if Paredes-Machado's allegations of torture are indeed true, for the reasons discussed below, the law simply does not support his request to dismiss the indictment.

1. *The "Outrageous Government Conduct" Defense is Not Available to Paredes-Machado*

Recently, the Sixth Circuit described the "outrageous government conduct" defense as "a bit of a leprechaun, discussed by many courts but rarely—if ever—found." *Monea v. United States*, No. 16-4250, 2019 WL 275921, at *4 (6th Cir. Jan. 22, 2019). Yet, it is not quite the amorphous, malleable concept Paredes-Machado needs it to be to prevail on his instant motion to dismiss the charges against him. To the extent courts have applied the doctrine at all, they have done so only where the government participated in the underlying criminal activity in an "outrageous" manner, yet without that participation constituting "entrapment." Here, however, there is no dispute that the challenged government conduct is wholly unconnected to Paredes-Machado's alleged criminal activity. Therefore, Paredes-Machado cannot rely on the defense. The analogous case of *U.S. v. Fernandez*, 500 F.Supp.2d 661 (W.D. Tex., 2006) is instructive on this point.

In *Fernandez*, the defendant asserted the outrageous government conduct defense, alleging that after her arrest but before her arraignment, FBI agents "forced her to stay in a motel room []

---

[4] This concern is made more acute by the United States' failure, in certain respects, "to conduct a reasonable search for discoverable information" related to Paredes-Machado's accusations of torture. (Doc. #865 at 4-7).

[and] threatened her and her family in order to coerce her into cooperating with the FBI." *Id.* at 664. In denying her motion to dismiss the charges based on the defense, the court explained:

> The outrageous government conduct defense originated in a Supreme Court case wherein the defendant asked the Court to reconsider the entrapment defense, and "adopt a rigid constitutional rule that would preclude any prosecution when it is shown that the criminal conduct would not have been possible had not an undercover agent supplied an indispensable means to the commission of the crime...." *United States v. Russell*, 411 U.S. 423, 431, []. The Court refused to adopt such a rule, but allowed that "we may someday be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." []. However, such a dismissal "is proper only in the rarest circumstances" and the defendant must prove "both substantial government involvement *in the offense* and a passive role by the defendant." *United States v. Gutierrez*, 343 F.3d 415, 421 (5th Cir. 2003) (emphasis added in *Fernandez*).
>
> Defendant does not claim that the Government participated in the alleged offenses with which she is charged, but rather that its post-arrest conduct was so outrageous as to warrant dismissal. However, the outrageous government conduct defense does not normally involve the post-arrest conduct of the government; "the outrageous-conduct defense requires not only government overinvolvement in the charged crime but a passive role by the defendant as well. A defendant who actively participates in the crime may not avail himself of the defense." [].

*Fernandez*, 500 F. Supp. 2d at 664–65 (internal citations omitted).

Chief Judge Castillo recently gave a similar explanation of the outrageous government conduct defense in the extremely analogous case of *Leon*:

> The "outrageous government conduct" defense finds its origins in *United States v. Russell*, 411 U.S. 423 (1973), where an undercover narcotics agent who was investigating the defendant and his confederates for illicitly manufacturing a drug offered them an essential ingredient that was difficult to obtain. *Id.* at 424-25. After the defendant was convicted, he appealed, and the U.S. Court of Appeals for the Ninth Circuit held that, in addition to a traditional entrapment defense, the interest in fairness dictated that "a defense to a criminal charge may be founded upon an intolerable degree of governmental participation in the criminal enterprise." *Id.* at 424 (citation omitted). The Supreme Court reversed, finding no basis to dismiss the indictment. *Id.* at 424-34. Within the opinion, the Supreme Court made the following comment: "While we may some day be presented with a situation

in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, the instant case is distinctly not of that breed." *Id.* at 431-32 (internal citation omitted).

The import of the Supreme Court's comment in *Russell* has long been the subject of legal debate. Observers have noted that the comment appeared to conflict with an earlier holding of a three-justice plurality in *Hampton v. United States*, 425 U.S. 484 (1976), which observed that "[t]he remedy of the criminal defendant with respect to acts of government agents, which far from being resisted, are encouraged by him, lies solely in the defense of entrapment." *United States v. Bontkowski*, 865 F.2d 129, 131-32 (7th Cir. 1989) (quoting *Hampton*, 425 U.S. at 490). In other words, it is unclear whether a majority of the Supreme Court would recognize an outrageous government conduct defense as distinct from an entrapment defense. *Id.* As a judge on the U.S. Court of Appeals for the Seventh Circuit explained, "some have read Justice Powell's concurring opinion" in *Hampton* as adopting an "outrageousness" defense," but "[i]f Justice Powell opened that door in *Hampton*, he shut it in *United States v. Payner*, 447 U.S. 727 (1980), writing for a majority of six." *United States v. Miller*, 891 F.2d 1265, 1272 (7th Cir. 1989) (internal citations omitted) (Easterbrook, J., concurring). In *Payner*, Justice Powell, writing for the majority, rejected an argument by the defense that improper tactics by law enforcement officers warranted suppression of evidence "under the Due Process Clause and the court's supervisory power." []. To paraphrase, the majority reasoned that even assuming the conduct of law enforcement officers "was so outrageous as to offend fundamental canons of decency and fairness, ... the rules developed under the fourth amendment fully reflected the interests of society and suspects, and ... replacing these rules with ill-defined supervisory or due process standards would undermine a balance properly struck." [] Other developments in the law since *Payner* "reinforce its message that appeals to 'fairness' are not satisfactory substitutes for legal rules."

*Leon*, 2018 WL 4339374, at *3-4.

Chief Judge Castillo went on to explain that "the Seventh Circuit has long declined to recognize [outrageous government conduct] as a valid defense," citing cases such as *United States v. Smith*, 792 F.3d 760, 766 (7th Cir. 2015) ("We repeatedly have reaffirmed our decision not to recognize the [outrageous government conduct] defense[.]"), *United States v. Stallworth*, 656 F.3d 721, 730 (7th Cir. 2011) ("Outrageous government conduct is not a defense in this circuit."), and *United States v. White*, 519 F.3d 342, 346 (7th Cir. 2008) ("[T]his circuit clearly and consistently

has refused to recognize any defense based on . . . outrageous government conduct.") (internal quotation marks omitted).  *Id.* at *4.  Chief Judge Castillo noted that, "[i]n the few cases where the Seventh Circuit has even considered the potential viability of the defense, the circumstances have involved entrapment or other types of misconduct by the government in connection with the commission of offense itself."  *Id.*

Similarly, the Sixth Circuit has *discussed* the "outrageous government conduct" defense as a theoretical guard against unacceptable government involvement in the criminal activity for which the defendant is charged where an entrapment defense would not apply.  But, like the Seventh Circuit, it has expressly *rejected* applying the defense.  In *U.S. v. Warwick*, 167 F.3d 965, 974 (6th Cir. 1999) (internal citations omitted), the Sixth Circuit explained:

> Under the outrageous government conduct defense, a defendant argues that the government's involvement in creating his crime (i.e., the means and degrees of inducement) was so great "that a criminal prosecution for the [crime] violates the fundamental principles of due process." . . . The outrageous government conduct defense is distinct from the affirmative defense of entrapment, which requires the defendant to establish that he was not predisposed to commit the crime.  []  Under the outrageous government conduct defense, conviction may be improper even if the evidence establishes a predisposition to commit the crime: this defense looks only at the government's conduct and determines whether it is sufficiently outrageous so as to violate the Constitution.  []  . . .
>
> In *Tucker*, this Court expressly held that a defendant whose defense sounds in inducement cannot avail himself of the "outrageous government conduct" defense.  We refused to recognize a defense "based solely on upon an objective assessment of the government's conduct in inducing the commission of crimes."  *Id.* at 1426.  We stated that, as a matter of law, "government conduct [that] induces a defendant to commit a crime, even if labeled 'outrageous,' does not violate that defendant's constitutional right of due process."  *Id.* at 1427.
>
> Since *Tucker*, we have consistently rejected defendants' attempts to argue that the government's conduct in inducing them to commit the crimes charged was so outrageous as to deprive them of their constitutional rights.  *See, e.g., United States v. Rogers*, 118 F.3d 466, 473 (6th Cir.1997) (noting that a defense that sounds in inducement is limited to entrapment and, under *Tucker*,

> does not implicate due process); *United States v. Branham*, 97 F.3d 835, 852
> (6th Cir.1996) (noting that *Tucker* "rejected the 'due process' defense
> sounding in inducement," and therefore refusing to consider the defendant's
> claim of outrageous government conduct).

*Id.* (internal citations omitted).  *See also Miller*, 696 F. App'x at 699 ("regardless of the propriety

of the government action [in inducing the defendant to commit a crime], the Sixth Circuit has not

adopted the outrageous government conduct defense."); *United States v. Flowers*, 712 F. App'x

492, 497 (6th Cir. 2017) ("Under the outrageous government conduct defense, government

involvement in a crime may be so excessive that it violates due process and requires the dismissal

of charges against a defendant even if the defendant was not entrapped.  Under the defense, the

government's conduct alone could bar prosecution, regardless of a defendant's predisposition.  The

outrageous government conduct defense is distinct from the defense of entrapment, which focuses

on a defendant's intent or predisposition to commit the crime.  In *Tucker*, we stated that 'there is

no authority in this circuit which holds that the government's conduct in inducing the commission

of a crime, if 'outrageous' enough, can bar prosecution of an otherwise predisposed defendant

under the Due Process Clause of the Fifth Amendment.'  Thus, we have not adopted the due

process defense of inducement.") (internal citations omitted); *United States v. Amawi*, 695 F.3d

457, 483 (6th Cir. 2012) ("[t]his court has soundly rejected the 'outrageous government conduct'

defense, looking instead to the doctrine of entrapment to assess a defense that sounds in

inducement[.]").  The Honorable Robert H. Cleland of this Court has also addressed the issue twice

recently, holding each time that the outrageous government conduct defense was unavailable in

the Sixth Circuit.  *See United States v. Castano*, No. 11-20066, 2018 WL 6616769, at *3 (E.D.

Mich. Dec. 18, 2018) ("neither the Supreme Court nor the Sixth Circuit recognizes a defense of

'outrageous government conduct'"); *see also United States v. Pamatmat*, No. 11-20551, 2015 WL

1608661, at *3 (E.D. Mich. Apr. 10, 2015) ("[t]his court has soundly rejected the 'outrageous

government conduct' defense, looking instead to the doctrine of entrapment to assess a defense that sounds in inducement.").

All of the foregoing case law is damning to, if not dispositive of, Paredes-Machado's argument, because here the alleged outrageous governmental conduct occurred after Paredes-Machado's arrest, and was wholly unconnected to the criminal conduct for which he is charged. Nevertheless, Paredes-Machado argues that U.S. Supreme Court and Sixth Circuit case law leaves open the possibility of applying the defense here.  In terms of Supreme Court precedent, he relies principally on *Rochin v. California*, 342 U.S. 165 (1952) and *Russell,* 411 U.S. 423.  He also claims the Sixth Circuit case of *United States v. Pelaez*, 930 F.2d 520 (6th Cir. 1991), is "factually closest to the present case," and leaves open the possibility of the outrageous government conduct defense. (Doc. #904 at 11-12).  But careful review of these cases shows they do not provide a basis for Paredes-Machado's reliance on the defense.

In *Rochin*, deputies had "some information that [Rochin] was selling narcotics."  After entering Rochin's home and forcing their way into his bedroom, the deputies observed Rochin seize two capsules from his nightstand and swallow them.  After a struggle where the deputies tried unsuccessfully to "extract the capsules," they arrested Rochin and brought him to a hospital. There, one of the officers directed a doctor to "pump" Rochin's stomach by forcing a tube down his throat and then injecting a solution into the tube that caused Rochin to vomit.  In his vomit, deputies found the two capsules which were later determined to contain morphine.

Rochin was charged with unlawful possession of narcotics, and was convicted by a California Superior Court judge who admitted evidence of the capsules over Rochin's objection. An appeals court affirmed the conviction despite finding that the officers had unlawfully entered Rochin's room, and had unlawfully assaulted Rochin both there and in the hospital.  The Supreme

Court of California affirmed.  However, the U.S. Supreme Court reversed, finding that "the requirements of the Due Process Clause 'inescapably imposes upon this Court an exercise of judgment upon the whole course of the **proceedings (resulting in a conviction)** in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses[,]'" and that, "[o]n the facts of this case **the conviction** of [Rochin] has been obtained by methods that offend the Due Process Clause." *Rochin*, 342 U.S. at 169, 174 (internal citation omitted) (emphasis added).  In other words, Rochin's conviction was not thrown out merely because he was subjected to "outrageous government conduct," but because he was *convicted* through the use of evidence obtained as a direct result of that conduct, in violation of his Due Process rights.  This problem will not arise in Paredes-Machado's case because the government has agreed not to use his videotaped statement or other evidence flowing from it at trial.  Thus, even if the alleged waterboarding in this case can be characterized as part of the "proceedings" in this criminal case, *Rochin* is simply inapposite.

Paredes-Machado's reliance on *Russell* is similarly unavailing.  In *Russell*, undercover agents provided defendants an ingredient essential for manufacturing a particular illicit drug, which the Court found "stops far short of violating that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." *Russell*, 411 U.S. at 432.  However, citing *Rochin*, the Court hypothesized, "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, cf. *Rochin* [], [but] the instant case is distinctly not of that breed." *Id.* at 431-32.  Thus, the Court was merely recognizing (without deciding) that government conduct that was

intertwined in the underlying criminal conduct could conceivably not constitute "entrapment," yet still be "so outrageous" as to bar the government from prosecuting the charge. *See Leon*, 2018 WL 4339374, at *3-4 ("**in addition to a traditional entrapment defense**, the interest in fairness dictated that 'a defense to a criminal charge may be founded upon an intolerable degree of **governmental participation in the criminal enterprise**.'") (emphasis added) (quoting *Russell*, 411 U.S. at 424). But again, "the Sixth Circuit has not adopted the outrageous government conduct defense" as a defense separate from a traditional entrapment defense. *Miller*, 696 F. App'x at 699. Moreover, the distinction between the two concepts is immaterial here because the "outrageous government conduct" alleged by Paredes-Machado is unrelated to the criminal conduct that forms the basis of the charges against him.[5]

The 1991 Sixth Circuit case of *Pelaez*, 930 F.2d 520, is also of no help to Paredes-Machado. In *Pelaez*, the defendant was charged in an indictment issued out of the Eastern District of Michigan with narcotics trafficking crimes. He was released on a bond before trial, and fled to Colombia. After being convicted *in absentia*, the United States sought Pelaez's extradition so he could be sentenced. The Colombian Supreme Court ruled that because the criminal conduct in question occurred prior to the 1991 extradition treaty between the two countries, Pelaez could not be extradited to the United States. Nevertheless, two years later, Pelaez was apprehended in Colombia by Colombian authorities and "extradited" to the United States. At sentencing, Pelaez argued that he should be returned to Colombia because he was only before the court due to his allegedly unlawful forcible abduction. The district court rejected that argument, and the Sixth

---

[5] Paredes-Machado also relies on *County of Sacramento v. Lewis*, 523 U.S. 833 (1998). But *Lewis* was a Section 1983 civil rights case brought by the estate of a decedent who died after a high-speed police chase. While the Court referenced a "shocks the conscience" standard for determining whether a particular "executive abuse of power" "offend[s] due process," *id.* at 846, nothing in that civil action suggests that a criminal defendant is entitled to have charges against him dismissed if "conscious-shocking" governmental conduct took place subsequent to his arrest.

Circuit affirmed, simply holding that "forcible abduction in itself does not offend due process or require dismissal of an indictment." *Id.* at 525.

Clearly, this holding does not help Paredes-Machado.  But rather than the case's holding, Paredes-Machado focuses on its dicta, in which the Sixth Circuit discussed *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974), explaining, "[*Toscanino* is] a Second Circuit opinion in which the court recognized the possibility that the declination of jurisdiction might be required 'as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights.'  []  In *Toscanino*, the defendant alleged that he had been abducted and tortured by United States agents during extradition to the United States.  In contrast, in the present case, defendant [] does not contend [], that United States officials had any involvement whatsoever in his extradition from Colombia in September 1989." *Pelaez*, 930 F.2d at 525 (internal citations omitted).  After noting that the "Fifth, Seventh, and Eleventh Circuits have refused to adopt a 'Toscanino exception' to the *Ker–Frisbie*[6] doctrine[,]" the Sixth Circuit wrote, "[e]ven if *Toscanino* were a valid exception to *Ker–Frisbie*, its rationale is wholly inapplicable to the case at bar. . . . Pelaez acknowledges that United States officials had no involvement in his seizure and removal from Colombia. . . . [and] has not even alleged, much less demonstrated, that his extradition was accomplished through torture, brutality, or physical force." *Id.* (internal citations omitted).

---

[6] The *Ker-Frisbie* doctrine, derived from *Ker v. People of State of Illinois,* 119 U.S. 436 (1886) and *Frisbie v. Collins,* 342 U.S. 519 (1952), holds that an "illegal arrest or detention does not void a subsequent conviction." *Gernstein v. Pugh,* 420 U.S. 103, 119 (1975).  This doctrine evolved from a series of cases in which defendants were prosecuted after being obtained through abduction and/or forced seizure with violence.  Courts held "such forcible abduction is no sufficient reason why the party should not answer when brought within the jurisdiction of the court which has the right to try him for such an offense." *Ker,* 119 U.S. at 444.  *See also Alvarez-Machain,* 504 U.S. 655, 661-62 (1992) ("the power of the court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.'").

Viewed in full context, it is clear that the *Pelaez* case does not stand for the proposition that the Sixth Circuit recognizes the outrageous government conduct defense urged by Paredes-Machado.  First, the Sixth Circuit did not say or even suggest that it disagreed with the Fifth, Seventh, and Eleventh's circuit's refusal to adopt a "*Toscanino* exception" to the *Ker-Frisbie* doctrine.  Indeed, immediately before referencing the positions of those Circuits, the *Pelaez* court noted that "the Supreme Court has consistently reaffirmed the *Ker–Frisbie* doctrine by application of the rule that the body or person of a defendant is never 'suppressible as a fruit of an unlawful police arrest' or detention."  *Pelaez*, 930 F.2d at 525 (citation omitted).  If anything, this suggests the Sixth Circuit found the Fifth, Seventh, and Eleventh Circuits' positions to be consistent with U.S. Supreme Court precedent.  Second, *Pelaez* is factually distinguishable from the instant case because it involved a defendant who was challenging his very apprehension, whereas here, Paredes-Machado does not challenge his arrest, but rather, how he was treated thereafter.  Third, *Pelaez* was decided in 1991, years before the Sixth Circuit issued landmark decisions on this very issue in cases such as *Tucker, Warwick*, and the other more recent cases discussed above, *supra* at 14-15, that make clear the outrageous government conduct defense is unavailable in this Circuit.

Finally, any argument by Paredes-Machado that the Court should use its "supervisory powers" to dismiss the charges against him as a remedy for the "outrageous government misconduct" he alleges, lacks merit.  Courts uniformly hold that dismissal of an indictment is disfavored as a remedy, and can only occur if the government's conduct prejudiced his right to a fair trial.  *See e.g.*, *United States v. Leedy*, 345 F. Supp. 3d 941, 959 (S.D. Ohio 2018) ("in light of 'the strong public interest in prosecuting serious crimes, prejudice to the defendant must be shown before dismissal of an indictment would be warranted.' . . .  For the Court to dismiss the indictment under its supervisory power, the defendant must show: (1) "demonstrated and longstanding

prosecutorial misconduct"; and (2) prejudice to the defense. [] Particularly where dismissal is based upon the Court's supervisory power rather than upon a constitutional basis, the defendant must demonstrate that the resulting prejudice has or will actually undermine a fair trial.") (internal citations omitted); *United States v. Koubriti*, 435 F. Supp. 2d 666, 681 (E.D. Mich. 2006), aff'd, 509 F.3d 746 (6th Cir. 2007) ("The power of a district court to dismiss a grand jury indictment under the supervisory powers doctrine is premised on the inherent ability of the federal courts to formulate procedural rules not specifically required by the Constitution or Congress to supervise the administration of justice. [] [W]hile a court may use its supervisory power to dismiss an indictment, dismissal is, generally speaking, a disfavored remedy. . . . [T]he Sixth Circuit [has] held that '[i]n order for this court to order dismissal of an indictment as part of its supervisory powers, there must be a showing of 'demonstrated and longstanding prosecutorial misconduct' as well as a showing of substantial 'prejudice to the defendant.' [] To meet this standard, thus, [the defendant] must show that the earlier misconduct was not remedied, or that there is some identifiable previously-tainted evidence that the Government seeks to use against him in a trial . . .") (internal citations omitted). Here, because the United States has agreed not to use at trial the videotaped statements (or other evidence that flowed from those statements), Paredes-Machado cannot show that the alleged "outrageous government conduct" prejudiced his right to a fair trial on the merits of the charges against him. Thus, dismissal of the charges would not be appropriate.

Because it is clear that there is no authority to dismiss the indictment due to the type of post-arrest government conduct alleged by Paredes-Machado, his instant motion lacks merit and should be denied.

       2.   *Paredes-Machado's Alternative Requested Remedy – Suppression of the*
            *Videotaped Statements – Is Moot*

Paredes-Machado argues that "if the Court finds dismissal unwarranted," his requested relief would be "to suppress all statements made by Mr. Paredes-Machado and his wife." (Doc. #885 at 1). However, as noted above, the government has already agreed that it will not use the statements in question (or any other evidence that may have flowed from those statements) at Paredes-Machado's trial. Accordingly, this aspect of Paredes-Machado's instant motion is moot.

## II.   RECOMMENDATION

For the reasons set forth above, **IT IS RECOMMENDED** that Paredes-Machado's Motion to Dismiss Indictment **(Doc. #885)** be **DENIED.**

Dated: March 28, 2019                            s/ David R. Grand
                                             DAVID R. GRAND
                                             UNITED STATES MAGISTRATE JUDGE

## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir.

2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 28, 2019.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager